[No. S127344. Apr. 9, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
LISA MARIE CAGE, Defendant and Appellant.

**COUNSEL**

Jeanne Courtney Vanderhoff, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson and Gary W. Schons, Assistant Attorneys General, Michael T. Murphy and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

David Labahn and George Kennedy for California District Attorneys Association as Amicus Curiae on behalf of Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), the United States Supreme Court announced a new standard for determining when the confrontation clause of the Sixth Amendment prohibits the use of hearsay evidence—i.e., an out-of-court statement offered for its truth—against a criminal defendant. *Crawford* held that this clause protects an accused against hearsay uttered by one who spoke as a " 'witness[]' " " 'bear[ing] testimony' " (541 U.S. at p. 51) if the declarant neither takes the stand at trial nor was otherwise available for cross-examination by the accused.

*Crawford* declined to provide a comprehensive assessment of what kinds of hearsay fall within "this core class of 'testimonial' statements." (*Crawford, supra*, 541 U.S. 36, 51.) However, the court concluded that, even under "a narrow standard," testimonial statements include those made, during a formal police interrogation, by one who was herself a suspect in the crime under investigation. (*Id.* at p. 52.)

State and federal courts have struggled to apply the *Crawford* concept of testimonial hearsay. The issue has particular impact in domestic abuse cases, where the prosecution may have to depend on information supplied outside of court by the victims—often victims of tender years—because they are not available to testify at trial.

Here, defendant was convicted of aggravated assault upon her 15-year-old son. The victim did not testify. The prosecution therefore relied, over defendant's state law and confrontation clause objections, on hearsay statements the victim made to a sheriff's deputy and to a treating physician. Though *Crawford* was decided after defendant's trial, while her appeal was pending, the high court's ruling applies retroactively to her case. We must therefore determine whether the hearsay statements admitted against her, or any of them, were testimonial for purposes of the confrontation clause.

In analyzing the issues, we find guidance in a more recent high court decision, *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*), which clarifies the distinction between testimonial and nontestimonial hearsay. We conclude that the victim's statements to the deputy, both in a hospital emergency room, and later on tape at the sheriff's station, were testimonial. Though the two occasions varied in their formality, all the attendant statements were given as an analog of testimony by a witness—they were made in response to focused police questioning whose primary purpose, objectively considered, was not to deal with an ongoing emergency, but to investigate the circumstances of a crime, i.e., "to 'establis[h] or prov[e]' some past fact." (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2276].)

We reach a contrary conclusion concerning the victim's statement to the physician who treated him at the hospital. In order to help diagnose the nature of the victim's slash wound, and to determine the appropriate treatment, the physician asked the victim a single question—"What happened?" The victim responded that his grandmother held him down while defendant, his mother, cut him.

The primary purpose of the physician's general question, objectively considered, was not to obtain proof of a past criminal act, or the identity of the perpetrator, for possible use in court, but to deal with a contemporaneous medical situation that required immediate information about what had caused the victim's wound. (See *Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2276].) The victim's answer was given in that context. The circumstances imposed none of the " ' "solemn[ity]" ' " (*id.* at p. ___ [126 S.Ct. at p. 2274]) that inheres in an interview by law enforcement officials, where false statements may constitute criminal offenses. (*Id.* at p. ___, fn. 5 [126 S.Ct. at

p. 2278].) Hence, the victim's statement lacked those attributes of testimony by a witness that are the concern of the confrontation clause.

Finally, we find that the erroneous admission of the victim's statements to the deputy was harmless beyond a reasonable doubt. We will therefore affirm the judgment of the Court of Appeal, which affirmed defendant's conviction.

## FACTS

An information charged defendant with assault by means likely to produce great bodily injury. (Pen. Code, § 245, subd. (a)(1).)[1] For purposes of enhancing the sentence, it was alleged that she personally used a deadly and dangerous weapon (§§ 667, 1192.7, subd. (c)(23)) and personally inflicted great bodily injury on the victim (§§ 1192.7, subd. (c)(8), 12022.7, subd. (a)). It was further alleged that she had previously been convicted of voluntary manslaughter (§ 192, subd. (a)), a serious felony (§ 667, subd. (a)), and that she was a "second strike" offender (§§ 667, subds. (c), (e), 1170.12, subd. (c)).

The following evidence was introduced:[2]

On May 16, 2001, around 2:30 p.m., Riverside County Deputy Sheriff Mullin was dispatched to a residence on a report of a family fight. As he approached the house, he saw a bloody towel and drops of blood. Inside, he found defendant picking up broken glass. There were two small cuts on her left hand. The glass top of a nearby coffee table was missing. After speaking to defendant, her mother, and her daughter Kathy, Mullin departed, having no reason to think a crime had been committed.

About an hour later, Mullin was dispatched to an intersection a mile or two away to look for an "injured person." There he found John F. (John), whom he ascertained to be defendant's son, sitting on the curb. There was a large cut on the left side of John's face. An ambulance and emergency medical personnel were already at the scene.

John was taken by ambulance to Riverside County Regional Medical Center. Mullin did not accompany John in the ambulance, but went to the hospital "at a later point." John was still in the emergency room, and had not yet been treated. Mullin asked John "what had happened between [him] and the defendant." John told Mullin the following: John and defendant got into

---

[1] All further unlabeled statutory references are to the Penal Code.

[2] There was no petition for rehearing in the Court of Appeal, so we rely primarily on that court's statement of the facts (see Cal. Rules of Court, rule 8.500(c)(2)), though we have supplemented the statement by means of our own close review of the record.

an argument over a belt, i.e., "she thought he was messing up the house." She began pushing him, he fell backward over a coffee table, and the glass top broke. Before he could get up, his grandmother came downstairs and held him. Defendant then picked up a piece of glass and cut him.

Dr. Russell, a head and neck surgeon at the hospital, treated John after he was initially evaluated by emergency room physicians. Dr. Russell testified that, pursuant to his usual practice, the "first thing" he did after introducing himself was to ask John "what happened." This was intended to obtain information about "what the injury might have been caused by, anything that would be relevant to my taking care of him." Given the nature of the wound, a deep gash, Dr. Russell said "the specific reason why I asked him about how it happened" was to determine whether the cut might contain ground-in debris that must be cleaned out to prevent infection.

In response to Dr. Russell's question, John said "he had been held down by his grandmother and cut by his mother." Dr. Russell asked no further questions, but turned his attention to treating the wound. He reported that John's demeanor was "quiet and quite respectful," and that John "seemed scared."

Dr. Russell said the gash extended five to six inches from the top of John's left ear, down across his jaw, and onto his neck. It had a slight backward curve toward the bottom, was relatively shallow at the top, and became progressively deeper along its length. It was "a very clean cut," which "looked like it had been done with a knife" but was not inconsistent with some other "very sharp" instrument, such as a piece of broken glass.

On the other hand, Dr. Russell opined, the injury was inconsistent with someone's head going through glass, as in a car accident, or standing by a window that shattered in an explosion, or being the target of thrown glass. In those instances, said Dr. Russell, he would expect other bruising, multiple "jagged" lacerations, and "more ripping rather than cutting type wounds." Dr. Russell added that "rarely do you see one isolated long cut like that with no other injuries on a body."

After John was released from the hospital, Deputy Mullin conducted a tape-recorded interview with him at the police station. On the tape, which was played for the jury, John stated the following: He had been staying with defendant. They got into an argument about a belt he could not find. She would not let him look for it in a closet. When he returned after looking for it in the garage, she accused him of "messing up" the garage and told him to leave. She pushed him onto the coffee table, which broke. His grandmother and his sister Kathy came downstairs. His grandmother was holding him

when defendant picked up "a big piece of glass" and "slashed me across the face with it." Defendant tried to do it again, but he broke free and "took off out the door running." Defendant "tried to throw glass at me, but it hit the door." He heard her say, "[C]all the police."

Defendant called two witnesses, her son Jermaine (who was seven at the time of trial and five at the time of the fight) and her daughter Kathy (who was 14 when she testified and 12 at the time of the fight). Jermaine testified as follows: John had been living with defendant. Jermaine saw them when they were already fighting. Defendant fell backwards onto the coffee table, with John on top. When John got up, a piece of glass that was on the floor cut his neck. Jermaine did not see his grandmother holding John.

Kathy testified as follows: John was not staying with defendant. He knocked on the door, and defendant told him to leave. They started pushing each other. John "grabbed [defendant's] hair and put her against the wall and told her he was gonna kill her." He pushed defendant "frontwards" onto the coffee table, breaking the glass; he fell on top of her. He then got up and ran out. Their grandmother tried to break up the fight. She did not hold John, and defendant did not cut him with a piece of glass. Defendant told Kathy to call 911. Kathy admitted that defendant is right-handed (thus suggesting that if she wielded a shard of glass, she would do so with her right hand against the left side of a person facing her in a struggle).[3]

As a rebuttal witness, the prosecution called Elisabeth Fenton, a social worker for child protective services. Fenton testified as follows: She was assigned to investigate the incident as a matter of child abuse in order to ascertain whether defendant's children were safe in her home. Fenton spoke with defendant's daughter Kathy about the incident in which John was injured. Kathy told Fenton John had been living in defendant's home for the past month. Kathy further related to Fenton that, on the day the incident occurred, she was upstairs watching television, heard noises, and came downstairs, but "did not see John," "didn't know where he'd gone," and "didn't know what happened." Kathy said her grandmother told her that John and defendant had fought, and that John had pushed the grandmother, causing her to fall. Fenton insisted Kathy said she had not seen any of the incident herself.

John did not testify. On the basis of the evidence described above, the jury found not true that defendant had personally inflicted great bodily injury, but otherwise sustained the charges and allegations. Defendant received a 13-year prison sentence.

---

[3] The grandmother died before trial.

Prior to trial, the prosecution had sought a ruling that John's statements to Mullin and Dr. Russell could be admitted for their truth even if he did not testify. These statements, the prosecution argued, came within state law hearsay exceptions for a victim's report of physical injury (Evid. Code, § 1370), and for spontaneous statements (*id.,* § 1240). The trial court ruled that all three statements were admissible as a matter of state law. It further determined that, because the statements bore particularized indicia of reliability, their admission without an opportunity for cross-examination did not violate the confrontation clause. (See *Idaho v. Wright* (1990) 497 U.S. 805 [111 L.Ed.2d 638, 110 S.Ct. 3139]; *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531] (*Roberts*).)

Defendant appealed her conviction, asserting error, both state and federal, in the admission of John's statements. While the appeal was pending, the high court decided *Crawford, supra,* 541 U.S. 36, which overruled *Roberts* and announced a new standard for determining when admission of hearsay statements violates the confrontation clause.[4]

The Court of Appeal, Fourth Appellate District, Division Two affirmed. The court first determined that all the statements were admissible as a matter of state law. Then, addressing the confrontation clause issues in light of *Crawford,* the court concluded that John's tape-recorded statement to Deputy Mullin at the police station was improperly admitted. This statement, the court reasoned, occurred during a structured police interrogation in pursuit of a criminal investigation, and was thus the kind of testimonial utterance with which *Crawford* was concerned.

However, the Court of Appeal held, John's earlier statements to Deputy Mullin and Dr. Russell at the hospital were both admissible. The statement to Dr. Russell, the court reasoned, was for purposes of treatment, not law enforcement, and the informal hospital statement to Deputy Mullin was not testimony given in response to a criminal investigation; Mullin was simply trying to determine whether a crime had even been committed.

Finally, the court ruled that admission of the taped statement was harmless beyond a reasonable doubt. The court noted that this statement was cumulative to, and consistent with, the two admissible statements, and the evidence otherwise strongly indicated defendant's guilt.

[4] A new rule announced by the high court applies to all criminal cases still then pending on appeal. (*Schriro v. Summerlin* (2004) 542 U.S. 348, 351 [159 L.Ed.2d 442, 124 S.Ct. 2519]; but cf. *Whorton v. Bockting* (2007) 549 U.S. ___, ___–___ [167 L.Ed.2d 1, 127 S.Ct. 1173, 1181–1184] [*Crawford* not "watershed" rule retroactive to cases already final on appeal].) No party disputes *Crawford*'s application to this case.

We granted defendant's petition for review, which raised only the post-*Crawford* confrontation clause issues. Briefing in this court has proceeded exclusively on those issues.[5] On the other hand, the People have made no argument, either in the Court of Appeal or in this court, that John's tape-recorded statement at the police station was admissible under *Crawford*. We therefore confine our discussion to whether his hospital statements, or either of them, fall within *Crawford*'s restrictions on confrontation clause admissibility.

As will appear, we agree with the Court of Appeal that the statement to Dr. Russell was admissible under *Crawford*, but we conclude, contrary to the Court of Appeal, that the hospital statement to Deputy Mullin was not. We nonetheless determine that the error in admitting the two police statements was harmless beyond a reasonable doubt.

## DISCUSSION

In *Roberts, supra*, 448 U.S. 56, the court held that the hearsay statement of a declarant not present for cross-examination at trial was admissible under the confrontation clause only if (1) the declarant was truly unavailable to testify and (2) the statement bore adequate indicia of reliability. Under this test, "reliability [could] be inferred without more in a case where the evidence [fell] within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." (*Roberts, supra*, at p. 66, fn. omitted.)

In *Crawford, supra*, 541 U.S. 36, the court had occasion to reevaluate how the admissibility of hearsay evidence must be determined under the confrontation clause.[6] In that case, petitioner Crawford and his wife Sylvia went looking for the victim, Lee, to confront Lee about an alleged attempt to rape Sylvia. During an ensuing argument at Lee's apartment, Crawford stabbed Lee in the chest. Crawford told the police he reacted when he thought he saw Lee reach for a weapon. Sylvia's tape-recorded police statement largely corroborated Crawford's account of the events that led to the assault, but, as to the critical sequence of events at the moment Lee was stabbed,

---

[5] Of course, in any *Crawford* analysis, the first question for the trial court is whether proffered hearsay would fall under a recognized state law hearsay exception. If it does not, the matter is resolved, and no further *Crawford* analysis is required. Here, the parties do not dispute the statements were otherwise admissible under the state hearsay law, and we do not reach that question.

[6] *Crawford* made clear that there are no confrontation clause restrictions on the introduction of out-of-court statements for *nonhearsay* purposes. As *Crawford* confirmed, "[t]he [Confrontation] Clause does not bar the use of [out-of-court] statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra*, 541 U.S. at p. 60, fn. 9, citing *Tennessee v. Street* (1985) 471 U.S. 409, 414 [85 L.Ed.2d 425, 105 S.Ct. 2078].)

Sylvia's version undermined Crawford's somewhat. Sylvia indicated that, at that moment, Lee had assumed an open-armed position, with his hands empty.

Charged with assault and attempted murder, Crawford claimed self-defense. The marital privilege rendered Sylvia unavailable to testify. Nonetheless, the prosecution sought to introduce her police statement to countermand Crawford's self-defense claim. The prosecution claimed that, because she admitted she led Crawford to Lee's apartment and thus facilitated the assault, the statement was admissible under the state hearsay exception for declarations against penal interest. Crawford claimed that, state law notwithstanding, his federal confrontation rights would be violated by the introduction of Sylvia's statement without an opportunity for cross-examination. Applying *Roberts, supra,* 448 U.S. 56, the trial court admitted the statement, reasoning that it exhibited " 'particularized guarantees of trustworthiness.' " (*Crawford, supra,* 541 U.S. at p. 40.)

Crawford was convicted of assault. The Washington Court of Appeals reversed, concluding, under a nine-factor test, that Sylvia's statement was not sufficiently trustworthy to satisfy the confrontation clause. The Washington Supreme Court reinstated the conviction, finding that, while Sylvia's statement did not fall within a firmly rooted hearsay exception, the balance weighed in favor of its reliability for confrontation clause purposes. The court reasoned that the two statements—Crawford's and Sylvia's—were sufficiently similar as to " 'overlap' "and " 'interlocked,' " thus establishing the likely trustworthiness of Sylvia's account. (*Crawford, supra,* 541 U.S. at p. 41.) On certiorari, the United States Supreme Court reversed.

▮ The Sixth Amendment, the court noted, guarantees a criminal accused's right "to be confronted with the *witnesses against* him." (U.S. Const., 6th Amend., cl. 4, italics added.) But this language, the court noted, is not self-explanatory; "witnesses against" could mean only those witnesses who testified at trial, all those whose statements are offered at trial, or "something in-between." (*Crawford, supra,* 541 U.S. 36, 43.) Hence, said the court, a historical analysis was necessary to ascertain the common understanding of the scope of the right to confront witnesses at the time the Amendment was adopted and ratified.

As the court recounted, English common law had long differed from European civil law practices as to the means by which witnesses gave testimony in criminal trials. The civil law form involved ex parte examinations by judges and prosecutors, while the common law tradition favored live testimony in court, subject to adversarial testing. But in the 1550's, during Queen Mary's reign, Parliament enacted statutes authorizing ex parte pretrial

examinations by judicial and prosecutorial officers. Statements obtained in such examinations became available as criminal evidence in some cases.

The most notorious early abuse of ex parte evidence was the 1603 treason trial of Sir Walter Raleigh. Raleigh was condemned on the basis of statements made by his alleged accomplice, Lord Cobham, during an ex parte examination by the Privy Council, and in a letter. Despite Raleigh's protests that he was being tried " 'by the Spanish Inquisition' " and contrary to " '[t]he Proof of the Common Law' " (*Crawford, supra,* 541 U.S. 36, 44), his demands to examine Cobham in person were denied.

The Raleigh case and others thereafter spurred steady reform of English jurisprudence on the issue of confrontation. By 1791, the Marian statutes notwithstanding, it was understood that in all criminal cases, evidence obtained by ex parte examination was not admissible against the accused if the witness was available at trial, or in derogation of the accused's right to cross-examine.

In the Colonies as well, protests were raised against laws and practices admitting, in criminal cases, evidence obtained in the civil law manner by ex parte examination without an opportunity for cross-examination. Many declarations of rights adopted around the time of the Revolution included an express right of confrontation. The absence of such a provision in the original Constitution produced calls for the inclusion of a specific guarantee that evidence in criminal cases be by cross-examination of live witnesses before triers of fact. The First Congress responded by including the confrontation clause in the proposal that became the Sixth Amendment. (*Crawford, supra,* 541 U.S. at pp. 43-50.)

From this history, the *Crawford* court drew two inferences. First, it noted, the confrontation clause was principally directed against the civil law mode of criminal procedure, in particular its system of ex parte examinations as evidence against the accused. Thus, on the one hand, the clause did not simply preserve cross-examination rights against witnesses who actually testified at trial, while leaving hearsay statements entirely to the changing laws of evidence. On the other hand, the clause was not concerned with *all* hearsay statements, or even all those that might be considered good candidates for exclusion, on commonsense grounds, as unreliable.

Instead, the court reasoned, the clause's express reference to "witnesses' " reflects its focus on those who " 'bear testimony,' " which typically is " '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " (*Crawford, supra,* 541 U.S. 36, 51, quoting Webster, An American Dictionary of the English Language (1828).) "An accuser who

makes a formal statement to government officers," said the court, "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (541 U.S. at p. 51.) Thus, the court explained, the constitutional text reflects an "especially acute concern with a specific type of out-of-court statement." (*Ibid.*)

The court noted that various formulations of this core class of testimonial statements had been suggested. One included formalized ex parte in-court testimony or its "functional equivalent[s]"—i.e., material such as affidavits, custodial examinations, confessions, depositions, prior testimony that the defendant was unable to cross-examine, " 'or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' " (*Crawford, supra,* 541 U.S. 36, 51–52.) Another included " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Id.* at p. 52.)

"[A]t a minimum," said the court, "testimonial," for purposes of the confrontation clause, "applies . . . to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Crawford, supra,* 541 U.S. 36, 68.) The court explained that, for purposes of the case at hand, it was using the term "interrogation" in its colloquial, rather than any technical or legal sense, and did not need to ascribe a precise meaning, because "Sylvia's recorded statement, knowingly given in response to structured police questioning, qualifie[d] under any conceivable definition." (*Crawford, supra,* at p. 53, fn. 4.)

The second clear inference from the court's historical analysis, it said, is that "the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. 36, 53–54.)[7] This requirement, the court concluded, is not merely "sufficient," but "necessary" and "dispositive." (541 U.S. at p. 55.) "Where testimonial statements are involved," said the court, "we do not think the Framers meant to leave the Sixth

---

[7] Read in isolation, some language in the court's opinion could be interpreted to suggest, paradoxically, that a witness's *absence* from the trial, as a result of true unavailability, and a *prior* opportunity for cross-examination, are prerequisites to admissibility of the witness's hearsay statements. But the opinion actually makes clear that "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements," and that "[t]he Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Crawford, supra,* 541 U.S. 36, 59, fn. 9.) We have construed *Crawford* accordingly. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Morrison* (2004) 34 Cal.4th 698, 720 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

Amendment's protection to the vagaries of the rules of evidence, much less to amorphous notions of 'reliability.' " (*Id.* at p. 61.) Hence, an opportunity for cross-examination cannot be excused by case-specific judicial determinations—subject to dispute and inconsistent application—that particular testimonial hearsay is sufficiently trustworthy or reliable. (*Id.* at pp. 60–68.) In the case at hand, the court explained, Sylvia's testimonial statement to the police was admitted for its truth against Crawford even though he had no opportunity to cross-examine her. This was improper, said the court, because the statement lacked "the only indicium of reliability sufficient to satisfy constitutional demands[,] [i.e.,] the one the Constitution actually prescribes: confrontation." (*Crawford, supra,* 541 U.S. 36, 69.) Accordingly, the court reversed the Washington Supreme Court's judgment upholding Crawford's conviction and remanded for proceedings not inconsistent with its opinion. (*Ibid.*)[8]

The *Crawford* majority did not foreclose the possibility that statements made outside the context of police investigation or interrogation could be testimonial. Moreover, the majority conceded that its "refusal to articulate a comprehensive definition [of testimonial hearsay] in this case will cause interim uncertainty." (*Crawford, supra,* 541 U.S. 36, 68, fn. 10.)

The predicted uncertainty has arisen, in numerous post-*Crawford* state and federal cases involving a myriad of hearsay statements made in various circumstances by persons unavailable for trial. We briefly discuss below the divergent results reached, in the post-*Crawford* era, as to whether, and when, hearsay statements to treating physicians are testimonial. But we think all the issues in the instant case are resolved by a careful examination of the high court's own more recent effort to clarify what it means by testimonial hearsay. The decision in point is *Davis, supra,* 547 U.S. 813 [126 S.Ct. 2266].[9]

---

[8] In reversing the state court judgment on grounds that the admission against Crawford of Sylvia's police statement violated the confrontation clause, the United States Supreme Court did not independently determine whether Crawford had suffered prejudice as a result of the improper evidence. We do not interpret this omission as a signal that the admission of testimonial hearsay without an opportunity for cross-examination is reversible per se. (See *Arizona v. Fulminante* (1991) 499 U.S. 279, 306–312 [113 L.Ed.2d 302, 111 S.Ct. 1246] [erroneous admission of evidence is mere "trial error," not amounting to a "structural defect[]" in the constitution of the trial mechanism," and is thus subject to evaluation for harmlessness].) We presume that, in subsequent proceedings in Crawford's case, lower courts remained free to determine, by appropriate standards, whether the admission of Sylvia's statement was prejudicial or harmless.

[9] *Davis* was decided while the instant matter was pending here on review. The parties had already submitted their briefs on the merits in this court. We therefore solicited, and received, supplemental briefs addressing the significance of *Davis* to the issues before us.

*Davis* consolidated and decided two different state cases concerning responses to out-of-court questions by law enforcement officials. In *Davis v. Washington*, No. 05-5224, a citizen, Michelle McCottry, called 911. In the tape-recorded call, the 911 operator asked, " 'What's going on,' " and McCottry replied, " 'He's here jumpin' on me again.' " Questioned further, McCottry indicated that " 'he' " had no weapons but was using his fists, and had not been drinking. After admonishing McCottry that " 'I've got help started,' " and to stay on the line, the operator asked the assailant's last and first name, and middle initial, learning that he was petitioner Adrian Martell Davis. At that point McCottry reported that " '[h]e's runnin' now.' " (*Davis, supra*, 547 U.S. 813, ___ [126 S.Ct. 2266, 2271].)

McCottry indicated further that Davis had " 'just run out the door' " and was entering a car with someone else. When McCottry continued to talk, the operator cut her off, saying, " 'Stop talking and answer my questions.' " The operator then gathered more information, including Davis's birthday, his purpose in coming to McCottry's house (to " 'get his stuff' " because McCottry was moving), and the context of the assault. Within four minutes after the 911 call began, the police arrived. They "observed McCottry's shaken state, the 'fresh injuries on her forearm and her face,' and her 'frantic efforts to gather her belongings and her children so that they could leave the residence.' " (*Davis, supra*, 547 U.S. 813, ___ [126 S.Ct. 2266, 2271].)

Davis was charged with violating a domestic no-contact order. McCottry did not appear at trial. The responding police officers testified to the injuries they observed. Over Davis's objection on confrontation clause grounds, the court admitted, for their truth, McCottry's statements on the 911 tape. The jury convicted Davis. The Washington Court of Appeals affirmed. The Washington Supreme Court agreed, holding that the portion of the call in which McCottry identified Davis was not testimonial, and that if any portions of the call were testimonial, their admission was harmless beyond a reasonable doubt. (*Davis, supra*, 547 U.S. 813 [126 S.Ct. 2266].)

In *Hammon v. Indiana*, No. 05-5705, police responded to a late-night report of a domestic disturbance. When they arrived, Amy Hammon was alone on the front porch, appearing somewhat frightened, but she told them that " ' "nothing was the matter." ' " (*Davis, supra*, 547 U.S. 813, ___ [126 S.Ct. 2266, 2272].) She permitted the police to enter the house. There they saw a gas heating unit in the corner of the living room, with flames shooting out the front because the glass on the front of the unit was broken. Herschel Hammon (Herschel), Amy's husband, was in the kitchen. He told police there had been an argument, but it had never become physical and was over. One officer sat down with Amy in the living room and " 'again asked [her] what had occurred.' " (*Ibid.*) Herschel tried several times to join the

conversation, and became angry when the officer " 'insisted that [he] stay separated from [Amy] so that we [could] investigate what . . . happened.' " (*Ibid.*) After hearing Amy's account, the officer had her fill out and sign a " 'battery affidavit.' " She handwrote that Herschel broke the furnace, shoved her down onto the broken glass, hit her in the chest, broke lamps and a telephone, tore up her van so she could not leave, and attacked her daughter.

Herschel was charged with domestic battery and violating probation. At his bench trial, Amy was subpoenaed but did not testify. The officer who had questioned her was called to recount what she had told him, and to authenticate her affidavit. Defense counsel repeatedly raised confrontation clause objections. The trial court admitted Amy's affidavit as a " 'present sense impression' " and her statements as " 'excited utterances.' " The officer then recited that Amy had told him the argument started over the couple's daughter going over to a boyfriend's house. According to Amy, the officer continued, Herschel broke the telephone, a lamp, and the glass on the front of the heater. He then threw Amy down, shoved her head into the broken glass, and punched her twice in the chest. (*Davis, supra,* 547 U.S. 813, ___–___ [126 S.Ct. 2266, 2272–2273].)

The court found Herschel guilty on both charges. The Indiana Court of Appeals and the Indiana Supreme Court both affirmed. The latter court reasoned that Amy's oral statement was not testimonial because it was not " 'given or taken' " with an eye to future use in legal proceedings, " 'where' " the motivations of the questioner and declarant are the central concerns.' " (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2273].) The Indiana high court conceded the affidavit was testimonial, but deemed its admission harmless beyond a reasonable doubt.

■ Assessing the cases under *Crawford,* the United States Supreme Court affirmed Davis's conviction, but reversed Herschel's. In parsing the two situations, the court first clarified a point it had left open in *Crawford,* now confirming that the confrontation clause is concerned *solely* with hearsay statements that are testimonial (*Davis, supra,* 547 U.S. 813, ___–___ [126 S.Ct. 2266, 2274–2276]), i.e., those by which " 'witnesses' "—the word used in the Constitution—make " ' "solemn declaration[s] or affirmation[s] . . . for the purpose of proving some fact." ' " (*Id.* at p. ___ [126 S.Ct. 2266, 2274].) As the court noted, "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter." (*Ibid.*)[10]

---

[10] Thus, the court has made clear that *Roberts, supra,* 448 U.S. 56, and its progeny are overruled for all purposes, and retain no relevance to a determination whether a particular hearsay statement is admissible under the confrontation clause. As the court indicated in *Davis,* "[i]t is the testimonial character of the statement that separates it from other hearsay that, while

On the other hand, the court cautioned, testimonial hearsay is not restricted to the most formal sort of *sworn* statements, such as affidavits and depositions. "[W]e do not think it conceivable," the court observed, "that the protections of the Confrontation Clause can readily be evaded by having a note-taking policeman *recite* the unsworn hearsay testimony of the declarant, instead of having the declarant sign a deposition." (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2276].) ". . . The solemnity of even an oral declaration of relevant past fact to an investigating officer is well enough established by the severe consequences that can attend a deliberate falsehood. [Citations.] . . ." (*Ibid.,* parentheses omitted.)

■ The court succinctly distinguished testimonial from nontestimonial statements as necessary to decide the matters before it. "Statements are nontestimonial," the court said, "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. 813, ___–___ [126 S.Ct. 2266, 2273–2274].)[11]

Applying this standard first to Davis's case, the court held that McCottry's responses to the 911 operator's questions while Davis was still in her house were nontestimonial. Objectively considered under all the circumstances, the court concluded, these questions and answers were intended primarily to deal with an ongoing emergency, not to establish or prove past facts for criminal use.

The court identified four factors that indicated McCottry was not testifying during the 911 call, as follows: First, a 911 call, and at least the initial questioning by the operator, are not primarily designed to prove some past fact, but to elicit current circumstances requiring police assistance. Second, though one *might* call 911 to relate a danger already past, McCottry clearly

---

subject to traditional limitations upon hearsay evidence, *is not subject to the Confrontation Clause.*" (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2273], italics added.) Thus, there is no basis for an inference that, even if a hearsay statement is nontestimonial, it must nonetheless undergo a *Roberts* analysis before it may be admitted under the Constitution.

[11] The court noted, as it had similarly implied in *Crawford,* that "[o]ur holding refers to interrogations because . . . the statements in the cases presently before us are the products of interrogations—which in some circumstances tend to generate testimonial responses." (*Davis, supra,* 547 U.S. 813, ___, fn. 1 [126 S.Ct. 2266, 2274].) Though the court did not explain exactly what it meant by "interrogations" in this context, the term seems to refer, in the court's mind, to "structured questioning" (see *Crawford, supra,* 541 U.S. 36, 53, fn. 4) by law enforcement officials, calling for considered factual responses by the person being questioned.

was seeking help against a bona fide, ongoing physical threat. Third, the conversation between McCottry and the 911 operator, viewed objectively, was focused on facilitating resolution of the current emergency, rather than establishing what had happened in the past.[12] Finally, the level of formality between McCottry's 911 interview and the testimonial police station interrogation in *Crawford* was striking. "Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe." (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2277].)

It was much easier, the court said, to resolve the testimonial nature of the police interview with Amy Hammon. Amy's statements to the questioning officer, the court observed, "were not much different from the statements we found to be testimonial in *Crawford.* It is entirely clear from the circumstances that the interrogation [of Amy] was part of an investigation into possibly criminal past conduct—as, indeed, the testifying officer expressly acknowledged." (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2278].) When the officer arrived, he saw no evidence of an altercation still in progress. Amy told him everything was fine, and that she faced no immediate threat. When he interviewed her a second time, in the living room, "he was not seeking to determine (as in [Davis's case]) 'what is happening,' but rather 'what happened.' Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime . . . ." (*Ibid.*)

Though the *Crawford* interview was more formal, the court conceded, none of the features that made it so (station house setting, *Miranda* warning, audio recording) was essential to its testimonial nature. In Herschel Hammon's case, "[i]t was formal enough that Amy's interrogation was conducted in a separate room, away from her husband . . . , with the officer receiving her replies for use in his 'investigation.' . . . Both declarants were actively separated from the defendant . . . . Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2278], fn. omitted.)

---

[12] In an aside, the court explained this was true "even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. [Citation.]" (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2276].)

■ We derive several basic principles from *Davis*. First, as noted above, the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial. Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony.[13] Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial. Fourth, the primary purpose for which a statement was given and taken is to be determined "objectively," considering all the circumstances that might reasonably bear on the intent of the participants in the conversation.[14] Fifth, sufficient formality and solemnity are present when, in a nonemergency situation, one responds to questioning by law enforcement officials, where deliberate falsehoods might be criminal offenses. Sixth, statements elicited by law enforcement officials are not testimonial if the primary purpose in giving and receiving them is to deal with a contemporaneous emergency, rather than to produce evidence about past events for possible use at a criminal trial.

Under these principles, it seems manifest that John's response to Deputy Mullin's question in the hospital waiting room was testimonial. Mullin had previously been dispatched to the home shared by defendant and John on reports of a domestic disturbance. There Mullin had seen drops of blood, a coffee table missing its glass top, and broken glass that defendant was

---

[13] Responding to the dissent's charge that the *Davis* majority was carrying its concept of testimonial hearsay beyond the abuses targeted by the confrontation clause, i.e., the depositions taken by Marian magistrates, the majority declared, "[w]e do not dispute that formality is indeed essential to testimonial utterance," though the necessary formality does not arise only from those specific practices, long superseded, that had been authorized by the Marian statutes. (*Davis, supra,* 547 U.S. 813, ___, fn. 5 [126 S.Ct. 2266, 2278].)

[14] One possible formulation of testimonial hearsay that was mentioned, but not expressly endorsed, by the *Crawford* court extended to all " 'statements . . . made under circumstances which would lead *an objective witness* reasonably to believe that the statement *would be available* for use at a later trial.' " (*Crawford, supra,* 541 U.S. 36, 52, italics added.) A broad interpretation of this formulation, as adopted by a number of post-*Crawford* decisions, could apply to virtually every out-of-court statement purporting to describe the circumstances of a crime or to identify its perpetrator, insofar as a reasonable person could conceive that the statement might later become criminal evidence. At oral argument, defendant's counsel came close to espousing such a view. Of course, *Crawford* itself suggested that the concept of testimonial statements does not go so far, noting that testimony is defined as a " 'solemn' " declaration made " '*for the purpose* of *establishing or proving* some fact,' " and that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." (*Id.* at p. 51, italics added.) *Davis* now confirms that the proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively,* are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial.

cleaning up. Defendant had cuts on her hand. An hour later, Mullin was called to a different location, a mile or two away, where a young man was sitting on the curb, his face slashed. There Mullin learned that the injured youth was defendant's son.

When Mullin arrived at this scene, emergency medical personnel were already attending to John. An ambulance took him to the hospital. Mullin did not assist in this procedure, but simply came to the hospital at a later time. Then, while John was awaiting treatment in the emergency room, Mullin asked John to describe "what [had] happened *between* [*him*] *and the defendant.*" (Italics added.)

Thus, by the time Mullin spoke with John in the hospital, the incident that caused John's injury had been over for more than an hour. The alleged assailant and the alleged victim were geographically separated, John had left the scene of the injury, and he thereafter had been taken to a remote location to receive medical treatment. Though he apparently had not yet been treated by a doctor when Mullin questioned him, he was in no danger of further violence as to which contemporaneous police intervention might be required.

Of course, John remained in need of prompt acute care by a physician for his injury. To that extent, there remained an ongoing emergency. Thus, if the primary purpose of the hospital conversation between Mullin and John, viewed objectively, had been to facilitate such emergency treatment, the statements thereby elicited might well not have the character of testimony.

However, there is no evidence the interview was so intended. Mullin had not previously been involved in John's emergency treatment. His role throughout had been as an investigating police officer. He arrived at the hospital only after John was already in medical hands. Mullin's clear purpose in coming to speak with John at this juncture was not to deal with a *present emergency*, but to obtain a fresh account of *past events involving defendant* as part of an inquiry into possible criminal activity. Indeed, the form of Mullin's question assumed that defendant might be the perpetrator of John's injury.[15]

---

[15] The People urge that Mullin's question was not an attempt to investigate a crime, for he did not yet know one had occurred, but merely an effort to " 'assess the situation' " (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2279]) to determine whether further immediate police action might be necessary to apprehend a perpetrator, to ensure the safety of the apprehending officers, and to safeguard the other minors in defendant's home. While "[s]uch exigencies may *often* mean that 'initial inquiries' produce nontestimonial statements" (*ibid.*), the record does not support the People's characterization here. Mullin had already visited defendant's residence on reports of a domestic disturbance, so he had reason to suspect John's injury was related to that incident. Yet, though it appears John was conscious and coherent when Mullin first encountered him sitting on the curb, there is no indication Mullin tried to obtain emergency information from John at that time. Mullin testified he did not go with John

The circumstances of this interview, in a hospital emergency room, were relatively informal, but they were no less formal or structured than the residential interview of Amy Hammon in *Davis*.[16] Here, as there, the requisite solemnity was imparted by the potentially criminal consequences of lying to a peace officer.[17] In fact, we perceive no material difference, for purposes of the confrontation clause, between the two interviews. We therefore must conclude that the admission of John's hospital statement to Mullin, without an opportunity for cross-examination by defendant, was a violation of the Sixth Amendment as construed in *Crawford* and *Davis*.

We reach a different conclusion, however, with respect to John's hospital statement to Dr. Russell. As indicated above, when John was seen by Dr. Russell, he needed immediate acute treatment for a five- or six-inch laceration on the side of his face and neck. As Dr. Russell explained, his sole object in asking John "what happened" was to determine, in accordance with his standard medical procedure, the exact nature of the wound, and thus the correct mode of treatment. The question was neutral in form, and though John responded by identifying defendant as his assailant, Dr. Russell did not pursue that avenue further. Objectively viewed, the primary purpose of the question, and the answer, was not to establish or prove past facts for possible criminal use, but to help Dr. Russell deal with the immediate medical situation he faced. It was thus akin to the 911 operator's emergency questioning of Michelle McCottry in *Davis*.

---

in the ambulance and simply proceeded to the hospital "at a later point." Once there, Mullin did not ask an open-ended question designed to elicit emergency information. Instead, on the basis of a suspicion derived from what he already knew, he posed a focused, accusatory, and investigatory inquiry; he asked what had happened "between [John] *and the defendant*." (Italics added.) Mullin did not testify that he was motivated by concern about an ongoing situation that might require further immediate police intervention, and, though he later returned to defendant's residence for investigatory purposes, there is no indication he followed up what John told him by initiating such emergency action. Under these circumstances, there is no basis for an "objective[]" conclusion that the "primary purpose" of John's statement, as given and taken, was to help the police deal with an ongoing situation, rather than to establish or prove past facts for potential future use in a criminal trial.

[16] Nor was Mullin's interview with John insufficiently "structured" to constitute an "interrogation," to the extent this is relevant. Mullin's testimony mentioned only a single question, but that question called for, and elicited, a considered and detailed narrative response. Similarly in *Davis*, an officer " 'asked [Amy Hammon] what had occurred' " and "[heard] [her] account." (*Davis, supra*, 547 U.S. 813, ___ [126 S.Ct. 2266, 2272].) Though this officer also had Amy fill out and sign a "battery affidavit," the high court did not deem this additional procedure crucial to a determination that Amy's oral statement to the officer was testimonial. Indeed, the *Davis* court noted that "[t]he Framers were no more willing to exempt from cross-examination . . . answers to open-ended questions than they were to exempt answers to detailed interrogation." (*Id.* at p. ___, fn. 1 [126 S.Ct. 2266, 2274].)

[17] Section 148.5, subdivision (a), makes it a misdemeanor to report to a sworn peace officer, including a deputy sheriff, that a felony or misdemeanor has been committed, knowing the report to be false.

Moreover, the context of the conversation had none of the formality or solemnity that characterizes testimony by witnesses. In speaking with Dr. Russell, John did not confront structured questioning by law enforcement authorities. There is no evidence that Dr. Russell was acting in conjunction with law enforcement, or that his question about the cause of John's injury had any evidence-gathering aim. So far as the record discloses, Dr. Russell made no effort to record or memorialize John's statements for later legal use. John faced no criminal sanction for any false statements he might make. The question and answer occurred in a private conversation between a patient and his doctor, by which both presumably sought only to ensure John's proper treatment.[18]

■ As defendant points out, *Davis* concerned only whether "interrogations" by *law enforcement officials* had produced testimonial statements. But the court made clear that even statements to law enforcement officials as the result of "interrogations" are not testimonial if given and taken for nonevidentiary purposes such as the need to cope with ongoing emergencies. (*Davis, supra,* 547 U.S. 813, ___, fn. 1 [126 S.Ct. 2266, 2273].) That being so, we cannot imagine that an informal statement to a person not affiliated with law enforcement, such as a medical doctor, solely for the nonevidentiary purpose of diagnosis and treatment, would be deemed testimonial. As we have indicated, the focus of both *Crawford* and *Davis* is on formal and solemn accusatory statements made to *law enforcement agents* in the context of *criminal investigations or inquiries*. An utterance of this kind, the court has indicated, is a modern analog of the ex parte statements obtained by magistrates under the Marian statutes. It renders the declarant, in substance, a "witness" who, by making the statement, bears testimony.

By contrast, John's statement made solely for purposes of medical treatment to a physician not affiliated with police or prosecutors has none of the characteristics the court has found significant in its recent analyses. If a statement made under "interrogation" *to a law enforcement official* is nontestimonial where "the circumstances objectively indicate" that it was not "primar[ily] [for the purpose of] establish[ing] or prov[ing] past events

---

[18] Indeed, the substance of the conversation between John, as patient, and Dr. Russell, as physician, would normally be confidential and privileged, subject only to the patient's waiver. (Evid. Code, §§ 990–994.) However, the physician-patient privilege does not apply in a criminal proceeding. (*Id.,* § 998.) While Dr. Russell indicated he was present for "at least part" of Deputy Mullin's hospital interview with John, there is no evidence Mullin was present during Dr. Russell's actual medical consultation with John. There is no merit to defense counsel's suggestion at oral argument that because Dr. Russell may have overheard part of what John told Mullin, John's later statement to *Dr. Russell,* made during the doctor's medical examination, was testimonial. At trial, Dr. Russell did not allude to anything he heard John say to Mullin. And Dr. Russell's incidental presence at the earlier conversation between John and Mullin did not transform him into an agent of law enforcement with a criminal investigatory purpose.

potentially relevant to later criminal prosecution" (*Davis, supra,* 547 U.S. 813, ___ [126 S.Ct. 2266, 2273–2274]), we cannot assume the court would apply a different, more stringent standard to a noninterrogational statement made *outside the context of law enforcement.* It seems clear the court would consider such a statement within neither the "core" nor the "perimeter" of the concerns addressed by the confrontation clause.

Defendant urges that statements to a physician by a minor victim of parental abuse are necessarily testimonial because the doctor is, by statute, a "mandated reporter" to law enforcement authorities of suspected child abuse. (See §§ 11164 et seq., 11165.7, subd. (a)(21).) We conclude, however, that Dr. Russell's mere status as a mandated reporter did not render John's statement to him testimonial.

Significantly, the reporting statute does not oblige a doctor to *investigate* or *ascertain,* for purposes of possible criminal prosecution, whether a patient has suffered such abuse. The physician's sole duty is to make a report "whenever [he or she] in his or her professional capacity or within the scope of his or her employment, *has knowledge of* or observes a child whom the [physician] *knows or reasonably suspects* has been the victim" of abuse or neglect. (§ 11166, subd. (a), italics added.)

■ The mere fact that doctors must report abuse they *see, suspect, or know of* in the course of practice does not transform them into *investigative agents* of law enforcement. Nor does it convert their medically motivated questions during the examination of minor patients into investigatory interrogations that elicit testimonial responses. Here, despite Dr. Russell's incidental status as a mandatory reporter of suspected abuse, "the circumstances objectively indicate" that the "primary purpose" of his question, and John's answer, was to pinpoint the nature of a serious acute injury in order to provide immediate treatment, not to establish, for potential criminal purposes, that John was abused.[19]

Defendant cites two pre-*Davis* California decisions to assert that hearsay statements to persons other than law enforcement officials may be testimonial for purposes of the confrontation clause. Neither alters our analysis of the instant facts.

In *People v. Pirwani* (2004) 119 Cal.App.4th 770 [14 Cal.Rptr.3d 673], the Court of Appeal held that out-of-court statements by a dependent adult, since

---

[19] As defense counsel conceded at oral argument, defendant's "mandated reporter" argument would mean that certain statements by a 17-year-old patient (see § 11165) to a treating physician are automatically testimonial, while an 18-year-old patient's identical statements, made under identical circumstances for identical reasons, are not. We see no basis to reach such an illogical conclusion.

deceased, to her social worker should have been excluded. But the sole issue addressed was whether the statements came within the *state* hearsay exception for spontaneous utterances (Evid. Code, § 1240; *Pirwani, supra,* at pp. 787–790.) The court expressed no opinion whether admission of this statement violated *Crawford.*

In *People v. Sisavath* (2004) 118 Cal.App.4th 1396 [13 Cal.Rptr.3d 753], a "forensic interview specialist" from the Fresno County Multidisciplinary Interview Center (MDIC) interviewed a four-year-old suspected sexual abuse victim. The interview took place after the defendant had been charged and his preliminary hearing had been completed. The prosecutor and a district attorney's investigator were present at the interview. When the victim was adjudged incompetent to testify, the investigator was allowed to testify about the statement adduced in the interview. The Court of Appeal found error, reasoning that, under these circumstances, "there is no serious question" but that the victim's statement was " ' "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." ' " (*Id.* at p. 1402, quoting *Crawford, supra,* 541 U.S. 36, 52.)

As indicated above, in *Davis* the United States Supreme Court has since refined the definition of testimonial statements. But the statement at issue in *Sisavath* might well be considered testimonial even under the more recent formulation. It was made in a formal setting, after criminal proceedings had commenced. It was elicited by a trained interviewer, in the presence of law enforcement personnel, with the manifest object of obtaining criminal evidence. The MDIC agent was simply acting as a law enforcement interrogator in the circumstances. Nothing in *Sisavath* suggests that the brief private conversation between John and Dr. Russell, for the purpose of providing and receiving medical treatment, produced a testimonial statement.[20]

---

[20] Though their analyses have varied, most post-*Crawford* decisions in other jurisdictions, both before and after *Davis,* have concluded that statements to physicians for purposes of medical evaluation and treatment were not testimonial where the doctors were not acting in cooperation with law enforcement to obtain evidence for use in a possible criminal prosecution. (E.g., *U.S. v. Peneaux* (8th Cir. 2005) 432 F.3d 882, 895–896; *Miller v. Fleming* (W.D.Wn. 2006) 2006 WL 435466, *5–*8 [pre-*Davis* case concluding, inter alia, that five-year-old declarant would not reasonably contemplate trial use]; *People v. Vigil* (Colo. 2006) 127 P.3d 916, 921–926 [pre-*Davis* case concluding, inter alia, that seven-year-old declarant would not reasonably contemplate trial use of her statements to medical "child protection team"]; *Com. v. DeOliveira* (2006) 447 Mass. 56 [849 N.E.2d 218, 224–227] [pre-*Davis* case concluding that statements of six-year-old declarant were not testimonial per se, as elicited by police interrogation, or testimonial in fact, in that declarant would not reasonably anticipate trial use]; *Foley v. State* (Miss. 2005) 914 So.2d 677, 685 [five-year-old child's statements made as part of "neutral medical evaluations" were not testimonial]; *State v. Vaught* (2004) 268 Neb. 316 [682 N.W.2d 284, 291] [four-year-old declarant's statements during medical exam for purposes of diagnosis and treatment, without involvement of law enforcement, did not fit any *Crawford*

Defendant points to a post-*Davis* decision, *State v. Mechling* (2006) 219 W.Va. 366 [633 S.E.2d 311] (*Mechling*). There, a physical altercation between the defendant and his girlfriend, Angela Thorn, was observed by Thorn's neighbor, Alvarez. Alvarez saw the defendant take a swing at Thorn, but could not tell if the blow actually landed. When Alvarez approached to intervene, the defendant fled, and Alvarez then spoke with Thorn. Thorn did not appear at the defendant's trial on a charge of domestic battery. Alvarez was permitted to testify that Thorn told him the defendant " 'hit me in the head and I've got a knot on my head.' " According to Alvarez, he then asked Ms. Thorn " 'if she was okay, and she said, yes, she would be okay.' " (633 S.E.2d at p. 315.)

The West Virginia Supreme Court of Appeals held that the admission of Thorn's hearsay statement through Alvarez might have violated *Crawford* and *Davis*. The *Mechling* court reasoned that the holdings in those two decisions could be distilled to the following: First, a statement is testimonial, whether or not given to agents of law enforcement, if made under circumstances that would lead an objective witness reasonably to believe it would be available for use in a later trial. Second, statements to law enforcement agents are not testimonial if made under circumstances that objectively indicate the primary purpose was to enable police to deal with an ongoing emergency, but are testimonial if no ongoing emergency exists, and the circumstances objectively indicate the purpose was to establish or prove past events potentially relevant to a later criminal prosecution. (*Mechling*, *supra*, 633 S.E.2d 311, 321.) Combining these concepts, the *Mechling* court appeared to conclude that *any*

formulation]; *State v. Moses* (2005) 129 Wn.App. 718 [119 P.3d 906, 911–912] [domestic abuse victim's statements to doctor during private exam were not testimonial; exam was for purpose of diagnosis and treatment, physician was not connected to criminal investigation, and record does not indicate declarant believed, or had reason to believe, statements would be used at trial]; but see, e.g., *People v. West* (2005) 355 Ill.App.3d 28 [291 Ill.Dec. 72, 823 N.E.2d 82, 90] [adult rape victim's statements to hospital emergency medical personnel were testimonial insofar as they alleged criminal conduct and identified a perpetrator]; compare, e.g., *U.S. v. Bordeaux* (8th Cir. 2005) 400 F.3d 548, 556 [child sex abuse victim's statements to "forensic interviewer" designated by law enforcement officers were testimonial, even if doctor observed interview and one purpose was medical treatment]; *In re T.T.* (2004) 351 Ill.App.3d 976 [287 Ill.Dec. 145, 815 N.E.2d 789, 803–804] [child sex abuse victim's accusatory statements to examining physician who was member of hospital child abuse protection unit and had testified as expert witness in child abuse cases were testimonial]; *State v. Snowden* (2005) 385 Md. 64 [867 A.2d 314, 322–330] [older child abuse victim's statements during formal interview by county "sexual abuse investigator" in conjunction with police investigation were testimonial]; *State v. Blue* (N.D. 2006) 2006 ND 134 [717 N.W.2d 558, 561–565] [post-*Davis* case; child sex abuse victim's statements to "forensic interviewer," with police involvement, were for purpose of collecting evidence, and were thus testimonial]; *State v. Mack* (2004) 337 Ore. 586 [101 P.3d 349] [statements by three-year-old witness to department of health services social worker who was interviewing witness under direction of police in murder investigation were testimonial].)

statement about criminal events, made by a witness thereto outside the context of an ongoing emergency, is testimonial. (*Id.* at p. 324.)

Thus, the West Virginia court concluded, Thorn's statements to Alvarez would be nontestimonial if they occurred in the context of Alvarez's attempts to intervene in an emergency. However, they would be testimonial, and thus excludable, if Thorn's statements "related 'what happened,' and the circumstances reflect a significant lapse of time before [they] were made to . . . Alvarez." (*Mechling, supra,* 633 S.E.2d 311, 324.) Finding the record on the issue deficient, the court remanded for further factual findings.

■ For reasons we have already explained at length, we respectfully disagree with the reasoning of *Mechling.* In our view, neither *Crawford* nor *Davis* made testimonial, and thus inadmissible as hearsay, all statements, other than emergency statements, that might reasonably be available for use in a criminal trial. To the extent they describe criminal events, "casual remark[s] to an acquaintance," such as Thorn's comments to Alvarez in *Mechling,* might be so used if otherwise admissible. (*Crawford, supra,* 541 U.S. at p. 51.) Yet *Crawford* itself strongly signaled that such casual remarks, made without the "solemn[ity]" and "purpose" characteristic of "testimony," are not the concern of the confrontation clause. (*Crawford, supra,* 541 U.S. 36, 51.)[21] And if *Crawford* left any doubt on the subject, *Davis* laid it to rest. There, the court made clear that, where statements to law enforcement officials are at issue, testimonial "solemn[ity]" and "purpose" are essential. No more stringent rule should apply to statements made to persons who are not law enforcement agents, and outside the context of a criminal investigation.

■ We therefore conclude that John's statement to Dr. Russell in the course of the physician's medical evaluation was not testimonial. Accordingly, admission of this statement for its truth against defendant at her trial did not contravene the confrontation clause, as construed in *Crawford* and *Davis,* even though she had no opportunity to cross-examine John. On the other hand, as we have indicated, John's statements to Deputy Mullin at the hospital and police station were testimonial. Thus, under the standards set forth in *Crawford* and *Davis,* they were inadmissible for truth against defendant without an opportunity for cross-examination. Because those standards apply retroactively to defendant's case, we must determine whether the admission of the latter statements at defendant's trial may have influenced the outcome, and thus rendered her trial unfair.

We are persuaded that admission of John's statements to Deputy Mullin was harmless beyond a reasonable doubt. (*Chapman v. California* (1967)

---

[21] We ourselves concluded, after *Crawford,* that an accusatory statement by a sexual abuse victim to a friend at school was not testimonial for purposes of the confrontation clause. (*People v. Griffin* (2004) 33 Cal.4th 536, 580, fn. 19 [15 Cal.Rptr.3d 743, 93 P.3d 344].)

386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) The statement to Dr. Russell, made for purposes of medical treatment, succinctly indicated what had caused John's injury. He told Dr. Russell that, while his grandmother held him, defendant had cut him. Dr. Russell reported that John's demeanor, as he answered Dr. Russell's question, was quiet and respectful, and that he seemed frightened.

Other evidence was substantially consistent with John's claim. At the outset, that evidence strongly indicated John had been injured by broken glass during a domestic argument. Shortly before he encountered the injury victim, Deputy Mullin had been dispatched to defendant's home. Outside the house, he saw a bloody towel and drops of blood. Inside, defendant was sweeping up broken glass, and the top of a coffee table was obviously missing. Defendant had cuts on her hand. From this evidence, and from the nature of John's wound itself—as described by Dr. Russell and depicted in several graphic photographs—a fact finder would almost certainly infer that John had been cut by a large piece of broken glass during an altercation in which defendant was involved.[22]

The parties did not dispute this inference, but sought to explain it in different ways. Relying on John's statements about the episode, which did not vary on the point, the prosecution insisted defendant had assaulted John with a shard of glass. The defense claimed he suffered an accidental injury when he fell among the glass fragments.[23] The case thus turned on whether John's wound was intentionally inflicted or accidentally sustained.

In this regard, Dr. Russell testified that, for several reasons, the cut on John's face and neck was not consistent with an accident. The wound, Dr. Russell noted, was "very clean," "looked like it had been done with a knife," and contained no glass fragments or other ground-in debris. In an accident involving broken glass, Dr. Russell said, he would expect more jagged lacerations, "more ripping rather than cutting type wounds."

Moreover, Dr. Russell observed, the deep, relatively straight five- or six-inch gash across John's face and neck was the only cut John had sustained; Dr. Russell saw no other significant bruises or lacerations. Such an isolated injury would be "rare[]," Dr. Russell indicated, for a person accidentally impacted by fragments of shattered or shattering glass. Moreover, Dr. Russell reported, the cut became deeper as it progressed from top to bottom. From this, the jury could readily infer that a sharp object was

---

[22] Thus, we are not persuaded by the dissent's assertion that the inference of a struggle arose only, or even primarily, from defense evidence, which, the dissent speculates, might not have been presented had John's statements to Deputy Mullin been excluded.

[23] Defendant did not claim she cut John intentionally but in self-defense, nor was there any intimation that a third person slashed John.

dragged downward across John's cheek and jaw with increasing pressure, in an intentional gouging fashion, rather than coming into incidental contact with his skin. Finally, as a vertical wound on the left side of John's face, the injury was naturally consistent with infliction by a right-handed person, such as defendant, during a face-to-face confrontation with the victim.

Through her own purported eyewitnesses, defendant disputed that she had assaulted John with a shard of glass. But the credibility of these witnesses was manifestly suspect. Defendant's son Jermaine said he did not see John's grandmother hold John and suggested John was cut accidentally during the fall. But Jermaine was only seven years old when he testified, and only five years old when he witnessed the struggle.

Defendant's teenage daughter Kathy also testified that she saw the altercation. She said John had been living elsewhere, arrived unannounced, started the physical confrontation, then ran away after the fall onto the coffee table. Kathy denied that John was held by his grandmother, and denied that defendant cut him either intentionally or accidentally. But Kathy's credibility was impeached by the testimony of social worker Fenton. Fenton said Kathy told her that John *was* living with defendant, and that Kathy, who had been upstairs watching television, arrived downstairs only after John had departed, did not see any part of the fight, and relied on an account supplied by the grandmother.

Of course, John's credibility in recounting the events that injured him was not irrelevant. His account was the only direct evidence that defendant had inflicted his wound, and had done so intentionally. Moreover, that John made this accusation three separate times, and provided additional details to the police, may have bolstered his credibility to some degree.

In the overall state of the evidence, however, John's statements to Deputy Mullin were largely cumulative. They were substantially consistent with his statement to Dr. Russell, and nothing in the additional details they contained was crucial to the charges. Furthermore, there was ample ground to believe John's statement to Dr. Russell on its own merits. In a hospital emergency room for acute treatment of a serious injury, and visibly frightened, John had every reason to answer the treating physician's questions truthfully.[24]

---

[24] The dissent speculates on various reasons why John might lie to the doctor, including anger at defendant, his own guilty involvement as the aggressor in the fight (though he suffered the only significant injury, and his sister's claim he attacked defendant was impeached), and his concern about an unrelated warrant for his arrest (which was before the jury only because of his improperly admitted tape-recorded police statement). The dissent also notes a pretrial comment by defense counsel that John had been diagnosed as schizophrenic. However, as we indicate in the text, the physical and circumstantial evidence supports John's statement to

Under these circumstances, we conclude, omission at trial of the statements to Deputy Mullin would not have altered the outcome. Accordingly, we affirm the judgment of the Court of Appeal, which upheld defendant's conviction.

## CONCLUSION

The judgment of the Court of Appeal is affirmed.

George, C. J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

**KENNARD, J.,** Dissenting.—I join the majority in upholding the trial court's admission of a statement that the alleged victim, a minor, made to an emergency room physician treating his injuries. I also agree that the trial court violated defendant's rights under the confrontation clause of the federal Constitution by admitting two statements that the minor made to a sheriff's deputy, describing the cause of the minor's injuries. I do not agree, however, that the erroneous admission of these two statements was harmless.

### I

While investigating a domestic disturbance at defendant's home, Riverside County Deputy Sheriff Perry Mullin saw a bloody towel and drops of blood outside the home; inside the home, he saw the top of a glass coffee table was missing and defendant was picking up broken glass. After talking to defendant and other family members, Deputy Mullin left. An hour later he was dispatched to an intersection a mile from defendant's home, where he found defendant's 15-year-old son, John F., who had not been present at the home during Mullin's earlier visit. John had a large cut running from his ear to his neck. Mullin saw to it that John was taken to a hospital.

Later, Deputy Mullin talked to John in the hospital's emergency room. John said that during an argument with his mother (defendant), she pushed him, causing him to fall on the glass coffee table and break it. John's grandmother then grabbed him; while she was holding him, defendant cut him with a shard of glass. When defendant started to cut John a second time, he broke free and ran away.

When the emergency room physician, Dr. Paul Russell, asked John what had happened, John replied he had been held down by his grandmother and cut by his mother.

---

Dr. Russell, and the conditions under which it was made were conducive to truth. Of course, the jury's assessment of his credibility would not have been affected under any circumstances by a mental health evaluation that was not in evidence. Hence, the dissent fails to cast reasonable doubt on our conclusion that the exclusion of John's police statements would not have altered the jury's verdict.

After John's release from the hospital, Deputy Mullin questioned him at the police station. In a tape-recorded statement, John described the assault in detail. He said he had been living with defendant for four or five weeks. On the day of the assault, defendant became upset when she saw John looking for a belt of his in a closet where she kept personal items. He went to the garage to look for another belt; when he returned, defendant accused him of messing up the garage. She then pulled John by his shirt, tearing it, after which she pushed him onto the glass coffee table, breaking it. John's grandmother came downstairs and grabbed John when he got up. Defendant picked up a piece of broken glass from the coffee table and slashed John's face; when defendant tried to slash John a second time, he broke free and ran out the door.

At trial, John did not testify, but the prosecution introduced his two statements to Deputy Mullin—the one made at the hospital and the one made at the police station—as well as his statement to Dr. Russell at the hospital. Dr. Russell testified that John's wound could have been inflicted by glass or a knife. He said he had treated many people with head injuries sustained by colliding with and breaking a pane of glass. Those wounds were ordinarily "very jagged," with "lots of more ripping rather than cutting type wounds"; "rarely" did he see "one isolated long cut . . . with no other injuries on a body," as was the case with John.

The defense called as a witness defendant's seven-year-old son Jermaine, who was five years old when the incident occurred. At the time, Jermaine testified, John was living at the house. Defendant and John got in a fight and fell onto the coffee table, breaking the glass. As John got up, a piece of glass that was on the floor cut his neck.

The defense also called as a witness defendant's 14-year-old daughter Kathy, who was 12 years old at the time of the incident. She testified that when John, who was not living at their home, came to the door, defendant told him to leave, and the two then began pushing each other. John threatened to kill defendant and pushed her onto the coffee table, breaking the glass, and John fell on top of defendant. John then got up and ran out. John's grandmother tried to break up the fight, and defendant told Kathy to call 911. In rebuttal, the prosecution impeached Kathy with her prior statement to a social worker that she had not seen the fight and that John was living at the family home.

The jury convicted defendant of assault by means of force likely to inflict great bodily injury.

## II

I have no quarrel with the majority's conclusion that the trial court's admission of John's two statements to Deputy Mullin violated defendant's right, under the Sixth Amendment to the federal Constitution, to confront the witnesses against her. In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] and in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266], the United States Supreme Court held that the confrontation clause bars admission of an out-of-court "testimonial" statement for the truth of the matter asserted when the defendant has no opportunity to cross-examine the declarant who made the statement. As the majority explains, John's two statements to Deputy Mullin came within the high court's definition of "testimonial" statements. Because admission of those statements violated the federal Constitution, the error may be found harmless only if, on appeal, the Attorney General demonstrates beyond a reasonable doubt that the result would have been the same notwithstanding the error. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].)

In characterizing the error as harmless, the majority reasons that John's statement at the hospital to Dr. Russell, which the trial court properly admitted, "succinctly indicated what had caused John's injury" (maj. opn., *ante*, at p. 992) and that John's two erroneously admitted statements to Deputy Mullin were "largely cumulative" (*id.* at p. 993) of John's brief statement to Dr. Russell. Not so.

Dr. Russell's description of John's account of the assault was quite pithy: "he had been held down by his grandmother and cut by his mother," a total of 13 words. By contrast, John's tape-recorded statement to Deputy Mullin was quite detailed, taking up more than 2,000 words (12 pages of transcript). The details in that statement may have been important to the jury. It seems rather unusual that a 15-year-old boy would be held down by his grandmother while being cut with broken glass by his mother. Absent some explanation of how that could have happened, the jury might well have thought that John concocted the story. The circumstance that the statement to Deputy Mullin was recorded could also have been significant, because the jury, after listening to John's voice, may have concluded that he *sounded* credible, a determination the jury could not have made from Dr. Russell's description of what John had told him. Finally, the jury may have given John's story greater credence because it learned that he gave roughly the same account on three different occasions: once to Dr. Russell, once to Deputy Mullin in the hospital's emergency room, and once at the police station. Thus, contrary to the majority, John's statements to Deputy Mullin were not "largely cumulative" of his statement to Dr. Russell. (Maj. opn., *ante*, at p. 993.)

According to the majority, the "evidence strongly indicated John had been injured by broken glass during a domestic argument." (Maj. opn., ante, at p. 992.) There was little evidence, however, of such a fight in the *prosecution's* case apart from John's two separate statements to Deputy Mullin, which the majority concedes were inadmissible. True, the *defense* presented evidence—through the testimony of John's brother and sister—that John had argued and struggled with his mother, and that they fell onto the coffee table and broke the glass top. But that evidence might never have been presented if the trial court had not permitted the prosecution to introduce John's two statements to Deputy Mullin: The defense might simply have rested without calling any witnesses and argued that John's brief out-of-court statement to Dr. Russell was insufficient to prove beyond a reasonable doubt that defendant had assaulted him.

The majority states: "In a hospital emergency room for acute treatment of a serious injury, and visibly frightened, John had every reason to answer the treating physician's questions *truthfully*." (Maj. opn., ante, at p. 993, italics added.) Perhaps. Perhaps not. As John acknowledged in his recorded statement to Deputy Mullin, he knew that there was a warrant for his arrest on an unrelated matter, and that he would be taken to juvenile hall. John also knew that Deputy Mullin had come to the hospital to investigate the circumstances of his injury, and it is reasonable to infer that John expected Dr. Russell to pass on to Deputy Mullin anything John would say about the cause of the injury. Thus, if John was the initial aggressor in his encounter with defendant, he might have had reason to give Dr. Russell an inaccurate account of the incident because of fear of prosecution if he told the truth. Moreover, John had reason to be angry at defendant because, by his own account, she had berated him and had torn his shirt before the injury occurred. His anger at his mother could have prompted him to falsely blame her for his injury. Furthermore, during pretrial discussions pertaining to the admissibility of John's statements to Dr. Russell and Deputy Mullin, defense counsel commented that John had been diagnosed as schizophrenic. If so, John may have suffered from a delusion that caused him to inaccurately describe the manner in which he was injured. In short, because the defense had no chance to cross-examine John, the veracity of his statement to Dr. Russell cannot be ascertained.

It may well be that if the trial court had excluded John's two separate statements to Deputy Mullin describing defendant's assault on him, the jury would still have found defendant guilty. But the jury could also have acquitted defendant. Because John's two erroneously admitted statements to Deputy Mullin were the most important evidence in the prosecution's case against defendant, I cannot say "beyond a reasonable doubt" (*Chapman v. California, supra*, 386 U.S. at p. 24) that, had they been excluded, the jury

would nevertheless have convicted her. I would therefore reverse the judgment of the Court of Appeal.