Filed 6/24/15  P. v. Hopson CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>RUTHETTA LOIS HOPSON,<br><br>     Defendant and Appellant. | D066684<br><br><br><br>(Super. Ct. No. RIF1105594) |

APPEAL from a judgment of the Superior Court of Riverside, Jeffrey J. Prevost, Judge.  Affirmed.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Andrew S. Mestman and Sean M. Rodriguez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant and appellant Ruthetta Hopson of first degree murder of her housemate, Laverna Brown.  (Pen. Code, § 187, subd. (a).)  The jury also found

true the allegations that Hopson killed Brown by means of lying in wait, and in the course of a robbery. (Pen. Code, § 190.2, subds. (a)(15) & (a)(17)(A).) Hopson was sentenced to life imprisonment without the possibility of parole.

On appeal, Hopson argues for reversal of the judgment on two separate alleged violations of her rights under the confrontation clause of the Sixth Amendment. (*Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).) As a criminal defendant, she had the right to cross-examine the witnesses who testified against her. (*Id.* at pp. 51, 54.) Testimonial statements are "statements, made with some formality, which, viewed objectively, are for the primary purpose of establishing and proving facts for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fn. 14 (*Cage*); italics omitted.) Confrontation clause analysis extends to the use of a declarant's out-of-court statements at trial, and the high court has explained that it is the "primary purpose of creating an out-of-court substitute for trial testimony" that implicates the confrontation clause. (*Michigan v. Bryant* (2011) 562 U.S. 344, 358 (*Bryant*).)

Even testimonial statements may be admissible for purposes other than establishing the truth of the matter asserted in them. (*Tennessee v. Street* (1985) 471 U.S. 409, 414 (*Street*); *Crawford, supra*, 541 U.S. at p. 59, fn. 9.) "[I]f a statement is not offered for its truth, or is nontestimonial in character, the confrontation clause is not a bar to admission." (*People v. Blacksher* (2011) 52 Cal. 4th 769, 813 (*Blacksher*).)

We apply these principles to Hopson's claims. At her trial, evidence about out-of-court statements made by her codefendant, Julius Thomas, after he was arrested and interviewed by detectives, was presented on two theories. By the time of trial, the

2

codefendant had committed suicide, and Hopson never had the opportunity to cross-examine him. The detectives testified at her trial that he (1) led them to the location of the murder weapon, and (2) made statements that conflicted with the version of the killing offered by Hopson during her testimony in her defense, as to which of the two was the planner and in charge during the execution of the plan.

Hopson's appeal first presents the issue of whether her confrontation rights were violated when one of the detectives testified, in the prosecution's case-in-chief, about "implied statements" the codefendant made to him when showing the detectives things, including the location where the weapon was later found.

Hopson next argues confrontation principles were violated when, during her cross-examination and the rebuttal case, the codefendant's out-of-court statements were brought in to attack the credibility of her testimony about how the offense was committed (i.e., she testified he had forced her to participate in the killings and hide the evidence), but she had no opportunity to confront him. (See Evid. Code,[1] § 1202 [credibility of hearsay declarant, a basis of this ruling].) Hopson further claims there was cumulative error, in that she might have decided not to testify, if not for the initial error in admitting the weapon testimony, and it in turn led to error violating her rights to confrontation of her codefendant.

As we will show, we accept for purposes of analysis that the codefendant's out-of-court statements during his police interview (interrogation) are testimonial in nature.

---

[1]     All further statutory references are to the Evidence Code unless noted.

3

(*Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*) [statements are testimonial in circumstances objectively indicating there is no ongoing emergency and the primary purpose of an interrogation "is to establish or prove past events potentially relevant to a criminal prosecution"].) However, this record shows they were offered for two nonhearsay purposes. First, his statements and conduct were offered to show their effect on the listeners and thus to explain how their investigation proceeded, when they went to the place where he left the weapon. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1162 (*Livingston*).)

Next, the codefendant's out-of-court "actual statements," as reported by the detective in rebuttal, were admissible for the nonhearsay purpose of impeaching Hopson's account at trial of the codefendant's threats and controlling conduct, before, during and after the killing. Hopson's testimony introduced the concept of what the codefendant told her out of court, and she placed an immediate issue into dispute, her credibility about the influence on her of his character and actions during these events. (*Street, supra*, 471 U.S. 409, 414 [no violation of confrontation rights occurred at a trial, when evidence about a nontestifying codefendant's confession was admitted for a nonhearsay purpose, on the immediate issue of coerced confessions].)

Under these unusual circumstances, we conclude Hopson "opened the door" to these permissible nonhearsay uses at trial, of the reported, testimonial out-of-court statements by her codefendant, and the evidence was not introduced in violation of the protections of the confrontation clause. (*Street, supra*, 471 U.S. 409, 414; *United States v. Cruz-Diaz* (1st Cir. 2008) 550 F.3d 169, 176-177 [a defendant's trial strategy may open

4

the door to admission of a statement with confrontation clause implications].)  We affirm the judgment.

## I

## *FACTUAL AND PROCEDURAL BACKGROUND*

### A.  Events of October 28-29, 2011

In October 2011, Hopson, a 39-year-old registered nursing assistant, was renting a room at a house owned by Darcy Timm.  Hopson worked off and on for a staffing service and had recently taken out loans to cover her $500 monthly rental payments.

Hopson met Julius Thomas, a bus driver, in 2006 and from 2008 to 2011, they had an intimate dating relationship.  He weighed over 300 lbs. and she called him her teddy bear.  Thomas normally called Hopson when he got off work and then came to her house in the middle of the night for a while.

Hopson wanted to move out of Timm's house and made plans to rent an apartment for $995 per month.  On her rental application, she placed her monthly income at $3,000.  Hopson's credit history was poor and the apartment manager (Cunningham) told her an $800 security deposit was required by October 29.  As of the end of October, Hopson had $16.05 in her checking account and $17.11 in savings.  At the end of September she had $19.49 in her checking account and $2.12 in savings.  In August, the balances were also low.

Brown, a 66-year-old registered nurse who worked for Riverside County Hospital, was also a renter at Timm's house.  Brown often worked 12-hour shifts and always paid her rent.  On the morning of October 28, Brown planned to fly to Georgia to visit family.

5

The evening of October 27, she was packing her suitcase and had some items written on "to-do" lists, such as packing shoes and going to the bank.

Around 5:15 a.m. on October 28, Timm got up and went out to the garage to do laundry. She kept tools in the garage, including a machete that her son owned, and saw its empty sheath on a workbench, although the machete was not there. Timm went back into the house and in the kitchen she noticed that a large knife in her butcher block was missing. As Timm was writing a note to Hopson to ask about the missing machete and knife, Hopson arrived at the side door. She told Timm she was going to be spending the day with her boyfriend, Thomas, and was there to change her clothes. When Timm asked her about the knife and machete, she said she did not know. Hopson mentioned to Timm that she had just washed away some spilled Coca Cola, so Timm should be careful not to slip in the area at the side of the house. Hopson and Thomas left in his car.

Timm returned to the garage and saw that an indoor/outdoor rug had been moved against the garage door. She took Hopson's trash can, containing a Coca Cola box, outside to empty it into a larger can. In the larger can, she found a blanket soaked in blood, and she saw blood and globs of flesh on the ground. Timm called 911, and an officer arrived. They found no signs of a break in or forced entry. Timm left Hopson a voicemail asking about the machete and the knife, but did not mention the bloody blanket.

About two and a half hours later, Hopson returned Timm's call and told her that she had moved some things around in the garage, but not the machete or knife. Hopson said she had noticed a blond, long haired, homeless looking man wearing a backpack and

6

walking around the neighborhood. Timm had not seen any homeless people in her neighborhood for at least 30 years.

When Timm came home from work early, Hopson was in the garage, and told her she had again washed the side of the house to remove the spilled Coca Cola. Timm asked her where some missing cleaning solution was, but Hopson said she did not know.

Later that day, Timm got a call from Brown's daughter, who was worried because Brown was not on the flight she had booked. Hopson was staying close to Timm at the time, but Timm did not want her to overhear the conversation or to learn that Timm was getting suspicious of her actions. Hopson asked her what she was doing that weekend, which Timm thought was strange, and she noticed Hopson had her hands behind her back, which scared her. Timm explained her plans and went outside, for the purpose of staying visible to the neighbors.

Thomas came over to Timm's house and left with Hopson so he could drive her to work. Timm went back into the house and called 911 again. She told the dispatcher that she was "scared to death," because she thought Hopson was involved in Brown's disappearance. She said Hopson looked "kind of disheveled" that morning and she must have "made up" the story about the homeless man with the backpack. Officer Jayson Jahanian arrived and interviewed Timm, who seemed to have been crying.

Investigators came to Timm's house around midnight and found blood on the sidewalk and in the trash can, along with two pairs of rubber gloves in the can. It looked like the wires on a motion activated light on the side of the house had been detached.

7

Later, Officer Jahanian went to the hospital where Hopson was working and asked her about Brown's disappearance. She seemed nervous but seemed to be "trying to remain calm." He thought she was lying when she said she didn't know anything about Brown. She told him that Thomas, her boyfriend and "a big, snuggly teddy bear," had come over to visit her that morning around 2:30 a.m. She said they went outside to talk, then came home around 4:30 a.m., when she noticed that Brown was moving about in her room and "getting ready for w—to go."

Next, Hopson told Officer Jahanian that she and Thomas left to go out for breakfast at McDonald's, and she then ran some errands. When she got home around 6:00 or 6:30 am, Brown's van was already gone. She said she asked Thomas to meet her at the check cashing businesses, since he lived nearby. She had called the apartment manager and asked her to reduce the security deposit so she could move into the new place, but the answer was no. Hopson unsuccessfully applied for a cash advance from a business, "Check Into Cash." She got a $300 advance from "Check N Go" around noon.

During the interview, Officer Jahanian told Hopson there was blood on the sidewalk at Timm's house. Hopson responded that she had not seen any, although she did hose down the ground at the side of the house to clean up some spilled soda. She told him she saw a "weird guy" with "scraggly, black hair underneath a hat" walking around the neighborhood that week. She agreed to go to the police station for an interview after work, around 2:00 a.m., and gave the officer Thomas's phone number, although she did not know his address.

8

After the officer left, Hopson's coworker asked her if she was okay. Hopson was acting upset and said she was unable to reach her "honey" by phone. She told the coworker that Brown, who "was" a nice lady, was missing.

When Hopson arrived at the police station, she was willing to talk in a videotaped interview. She was not under arrest. She told Officers Richard Wheeler and Rick Cobb that she had a good relationship with Brown, and the last time she saw her was when Brown came home from work that night and started to pack. Hopson then went to sleep until Thomas called her and came over around 2:00 a.m. She mentioned that she loved and adored him. When they went outside, they noticed a "weird" guy with scraggly blond hair and a backpack walking around the neighborhood. She and Thomas went to a nearby park for about an hour. When they came back to the house through the front door, Hopson saw a light on in Brown's room and assumed she was home and awake. Thomas took Hopson to McDonald's for breakfast that morning.

When Hopson came home, she ran into Timm. Hopson then went out the back door, spilling a can of Coca Cola she took from the garage. She sprayed the ground with a hose before leaving with Thomas. They drove around for a while and then Thomas dropped her off near a bus stop, where she went shopping for paint and furniture for her new apartment. She was not sure where Thomas went.

Hopson explained to the officers that when she returned home from her errands around 2:30 that afternoon, she used cleaning solution and a broom to spray and scrub the Coca Cola she had spilled earlier. When the officers told her there was blood in the exact same location as the soda spill, she acted surprised, since she thought she was cleaning up

9

soda, not blood. She started to pause in her responses and seemed to get quieter than before. When the officers mentioned she had referred to Brown in the past tense, she said she did not mean to do so. She told them she did not take the machete or the butcher knife, and she was not involved with the bloody blanket found in the trash can.

Officers tracked Thomas's cell phone signals and found that as of October 29, around 3:20 a.m., he was at or near Republic Street in Riverside. Later that day, they found Brown's van nearby in an empty parking lot. Her body was inside, lying face down, with a spray bottle lying on her back. Her throat had been cut and it appeared she had been dragged into the van through the driver's side. Her suitcase containing clothing and toiletries was in the front passenger's seat, but no shoes, cell phone or purse were there.

### B. Events of November 1-December 15, 2011

Both Hopson and Thomas were arrested. At first, Thomas denied participating in any killing. In his second interview on November 1, 2011, Thomas broke down and confessed that he and Hopson had planned the killing, and although he wanted to back out, she persuaded him to go through with it. He cried and asked the detectives to apologize for him to Brown's family. The detectives took him out in a marked police car, and Thomas showed them where he had dumped some bloody clothing, and where he had thrown the machete into a fenced off canal area. The dumpster had been emptied. It was dark and nothing could be found. However, the next day, Detective Cobb went to the canal area and found the machete from Timm's garage. Brown's blood was found on it. No knife was recovered.

10

Shortly after Hopson was jailed, she talked to family and friends on the phone and told them that she had seen Thomas in passing, and that he had encouraged her to pray and told her they would both get through this. She told her son that Thomas said to say hello to him. She asked her friend to find Thomas's jail address so she could correspond with him.

Over the next month or two, Hopson sent Thomas notes saying she loved him and missed him. Later, she sent a note breaking off their relationship. In another letter dated December 7, 2011, she expressed her continuing love and loyalty and asked him about statements she heard he had made to the police.

In December 2011, Thomas replied, "Goodbye. Like you said, you won't write no more. That's fine. You did this, not me . . . . Don't waste my time no more. That's how you want to be. Well, have a nice life."

On December 15, 2011, Thomas committed suicide in jail. Letters from Hopson were found in his cell. In her cell, investigators found a post-it note with Thomas's address on it, crossed out. Underneath his address, she wrote, "My love is gone and I pray he is in heaven with Jesus. 7/6/81-12/16/11."

## C. Trial Proceedings

After Hopson was arrested, a neighbor helped Timm clean out her room. They found receipts from the evening of October 27, showing that Hopson went shopping and bought a folding knife and pepper spray for $76.46. The same evening, she bought clothes at Target in large sizes (including a hooded sweatshirt and sweatpants).

11

DNA testing of the blood on the blanket, on the ground, and in splatters in the garage and on the house revealed that it belonged to Brown. She had died from a sharp force injury to her neck, which was cut open down to her spinal cord, severing the carotid artery, trachea, and esophagus. Such wounds could have been caused by an attack with a machete or a butcher's knife. Brown did not have any defensive wounds.

The steering wheel of the van yielded traces of Hopson's DNA, as well as Brown's, but none from Thomas. According to Timm, Brown had sometimes given Hopson rides to the store, but to Timm's knowledge, Hopson did not drive the van herself.

Cell phone evidence was presented of the numerous messages and frequent telephone calls that Hopson exchanged with Thomas between October 27 and 29. On October 28, between 1:49 a.m. and 2:32 a.m., Thomas called Hopson while going toward Timm's house. Hopson received his calls in the location of Timm's house. Around 7:42 a.m., Thomas called Hopson from somewhere around the cell tower nearest to where the machete was found. Around 7:56 a.m., Thomas called Hopson from somewhere around the cell tower where Brown's van was found.

At trial, Detective Cobb testified about driving around with Thomas after he confessed, and about going back the next day and finding the machete at the location Thomas pointed out to him. Cobb did not mention Hopson to the jury in connection with describing Thomas's acts that showed detectives where he left the machete.

The thrust of Hopson's defense case was her testimony that Thomas forced her to participate in the robbery and killing, by repeatedly threatening her and her adult son.

12

Hopson explained that she never met Thomas's relatives or went to his house, and she believed he was divorced. At some point, he told her that he had killed someone and beaten someone else, but she loved him and continued the relationship. Another reason was that he threatened to harm her if they broke up.

Hopson said that as a bus driver, Thomas was concerned about getting germs from the public, so she brought him gloves and protective booties. At Thomas's request on October 27, Hopson bought gifts for his sister, the large size sweatpants outfit he later wore during the killing. She told Thomas that Brown would be out of town that weekend, so that they could spend time together without disturbing anyone, since he did not like to come over if the other women were awake in the house. Hopson had mentioned to him that Timm kept a machete at her house.

Hopson testified that when she responded to Thomas's telephone call that night by meeting him in the garage at her house, she was shocked to find Brown lying bloody and dead. Thomas was wearing the gloves and booties she had given him, and he told Hopson that when he tried to rob Brown of her travel money, she recognized him and he killed her with the machete and the butcher knife. After Thomas threatened to kill Hopson and her son if she did not help him, Hopson cleaned up the blood and helped Thomas hide Brown's body. At Thomas's direction, Hopson drove Brown's van to a parking lot to leave it, so it would look like Brown was away from home, as Brown had planned.

Thomas then picked Hopson up and they went to McDonald's, where Thomas ordered apple pie and soda, but they didn't eat or drink them. Thomas told Hopson to tell

13

the police that a long-haired homeless man must have killed Brown. He told her not to betray him, because "Snitches will die, and even if you're locked up, they will get to you."

As they returned to Timm's house, Thomas required Hopson to go into a 7/11 store to buy Coca Cola for use in cleaning up the blood. When she was done cleaning, she put the clothes she was wearing in bags in Thomas's car. Eventually, Thomas threw away the bags of clothes, the machete, and the knife. Although Hopson bought a small knife and pepper spray during the week of Brown's killing, she did so for purposes of self-defense. When she wrote letters to Thomas while they were both in jail, she wanted to stay on good terms so he would not have her son harmed.

Because of the nature of Hopson's confrontation clause arguments, which must be analyzed within their complete factual context, we defer setting forth further details of her testimony on cross-examination and in response to the rebuttal case, until our discussion of the merits of her claims. (Pts. III-IV, *post*.) Although she raised confrontation clause objections to the detectives' accounts of what Thomas said to them, she did not request any admonitions from the trial court that the jury should view their testimony, or her own, for any limited purposes. She clarifies in her reply brief that she is not claiming error on the basis of a lack of such limiting instructions, nor does she claim prosecutorial misconduct in the introduction of evidence.

At the close of testimony, the jury was instructed in standard language, including how to evaluate prior statements made by a witness or by the defendant. After argument, the jurors deliberated and returned verdicts convicting Hopson of first degree murder and

14

the special circumstances as charged (lying in wait).  She was sentenced to life

imprisonment without the possibility of parole, and filed this appeal.

II

*SCOPE OF REQUIRED CONFRONTATION ANALYSIS*
*OF "TESTIMONIAL" STATEMENTS*

In *Crawford, supra*, 541 U.S. 36, the court acknowledged the confrontation clause

"does not bar the use of testimonial statements for purposes other than establishing the

truth of the matter asserted."  (*Id.* at p. 59, fn. 9.)  As *Crawford* was interpreted in *Cage*,

*supra*, 40 Cal.4th 965, 984, "the confrontation clause is concerned solely with hearsay

statements that are testimonial."[2]  The focus of analysis under the clause must be on

" 'witnesses' against the accused--in other words, those who 'bear testimony.' "

(*Crawford, supra*, at p. 51.)  By contrast, when an out-of-court statement is not offered

for the truth of its contents, or the statement is "nontestimonial in character, the

confrontation clause is not a bar to admission."  (*Blacksher, supra*, 52 Cal.4th at p. 813.)

In *Bryant, supra,* 562 U.S. at page 355, the Supreme Court interpreted *Davis,*

*supra*, 547 U.S. 813 as making it clear "that not all those questioned by the police are

witnesses and not all 'interrogations by law enforcement officers,' [citation] are subject to

the Confrontation Clause."  (*Bryant, supra,* at p. 355; see *Crawford, supra,* 541 U.S. at

---

[2]     " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."  (§ 1200, subd. (a).)  It should be noted that the California Supreme Court has two confrontation clause cases before it, concerning the use of gang expert testimony that relies on testimonial hearsay.  (*People v. Archuleta*, review granted May 19, 2014, S218640; *People v. Sanchez,* review granted May 14, 2014, S216681.)  They do not directly concern the issues in this case.

15

p. 53.) Nevertheless, we think it is clear on this record that Thomas's statements to detectives, created during a postarrest, more or less formalized interview, must be characterized as testimonial in nature. This approach will obviate one of the usual components of confrontation clause analysis, which would otherwise seek to determine the "primary purpose of creating an out-of-court substitute for trial testimony," as it implicates testimonial status. (*Blacksher, supra*, 52 Cal. 4th 769, 813; *Bryant, supra,* at p. 358.)

Specifically, the parties have not identified any factors that could have affected whether Thomas's statements were "testimonial" in nature or not (e.g., an ongoing emergency). (Cf. *Bryant, supra,* 562 U.S. at p. 358 ["[T]here may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony," italics omitted]; *id*. at p. 362, fn. 9 [discussing various hearsay exceptions that cover statements that "by their nature [were] made for a purpose other than for use in a prosecution"].) On this record, we are able to conclude that Thomas's statements were testimonial under the usual definitions.

We are reminded by *Crawford, supra,* 541 U.S. 36, that the confrontation clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Id.* at p. 59, fn. 9.) As we will show, the record does not support either of Hopson's arguments that an out-of-court statement was offered against her "for the truth of its contents." (*Blacksher, supra*, 52 Cal. 4th 769, 813.) Thus, it is unnecessary to carry out any extensive hearsay analysis, and we shall discuss hearsay

issues only in connection with the trial court's (erroneous) ruling under section 1202, pertaining to the credibility of Thomas, as a "hearsay declarant."[3]  (Pt. IV, *post*.)

Accordingly, we focus not upon the purpose of Thomas in creating his statements in a role as a "hearsay declarant," but instead, upon the purpose of the prosecution at trial in offering evidence of those statements, by way of the testimony of the detectives.  Both as to (1) Detective Cobb's version of Thomas's statements and how they led Cobb to discover the discarded weapon, and as to (2) Detective Wheeler's report of Thomas's statements about why the killing occurred, we address whether they fell within the scope of nonhearsay evidence, and if they were therefore outside the concerns and protections of the confrontation clause.

As will be shown, our inquiry need not reach the component of confrontation clause analysis that applies a harmless error standard.  (*Livingston, supra*, 53 Cal.4th 1145, 1158-1159 [confrontation clause violations are subject to federal harmless error analysis].)

---

[3]     Section 1202 provides in relevant part:  "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct."

# III

*EVIDENCE LEADING TO LOCATION OF WEAPON; THOMAS'S OUT-OF-COURT STATEMENTS AND CONDUCT, AS PART OF PROSECUTOR'S CASE-IN-CHIEF*

## A. Introduction to Issues

Evidence was presented to show that Thomas participated with Hopson in attempting to rob Brown of any travel money she might have obtained for her plan to leave town, but Brown was killed in the attempt. After Thomas and Hopson were arrested, he confessed to detectives and led them to the location of one of the weapons used in the killing, a machete. Six weeks later, he committed suicide in jail.

Before trial, the court limited the scope of Detective Cobb's testimony to allow him to describe the search for the machete, but not to reference Hopson or implicate her as a participant. She objected to the admission of Thomas's statements for any purpose other than to show how the machete was found. The court said that if the prosecutor wanted to introduce Thomas's statements for impeachment purposes, the matter would be addressed at a sidebar.

Detective Cobb testified in the prosecution's case-in-chief about how they later found the machete. The prosecutor did not play any recording of Thomas's statements for the jury.

Hopson contends the trial court committed prejudicial error when it admitted evidence at trial of these out-of-court statements, testimonial in nature, as "indirect" statements that harmed her defense. Hopson thus argues her rights under the confrontation clause were violated, because Thomas was unavailable as a witness and she

18

could not cross-examine him. She further contends the machete was erroneously admitted into evidence, because officers would not have found the weapon if not for Thomas' out-of-court statements to them.

B. Authority and Analysis

Hopson characterizes her claim as one of first impression in California, as follows: "Whether evidence of a suspect's implied statements to the police can constitute evidence of a testimonial statement which cannot be used at trial against a criminal defendant in the absence of an opportunity by that defendant to cross-examine the person who made those implied statements." However, she cannot properly characterize Thomas's conduct in leading officers to the weapon as "implied statements" about where it could be found, because in this instance, his statements and conduct were not offered for their truth. " 'An implied statement may be inferred from an express statement whenever it is reasonable to conclude: (1) that declarant in fact intended to make such implied statement, or (2) that a recipient of declarant's express statement would reasonably believe that declarant intended by his express statement to make the implied statement.' " (*People v. Garcia* (2008) 168 Cal.App.4th 261, 289; italics omitted.) Here, however, Thomas's ability to lead detectives to the location of the machete was offered not to show the truth that he knew where it was, but to show how the investigation proceeded.

In *Livingston, supra*, 53 Cal.4th 1145, 1162, the court identified and applied this " ' "important category of nonhearsay evidence—evidence of a declarant's statement that is offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief.

19

The statement is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement." ' "

Hopson relies on cases such as *United States v. Meises* (1st Cir. 2011) 645 F.3d 5, for the concept that a prosecutor cannot evade the limitations of the confrontation clause "by weaving an unavailable declarant's statements into another witness's testimony by implication." (*Id.* at p. 22.) In that case, the prosecutor asked an officer whether a nontestifying codefendant had "said anything during his interview that changed the targets of the investigation and prompted the defendants' arrests." (*Id.* at p. 21.) When the officer said yes, the court found that such testimony "plainly told the jurors" that the codefendant said the defendant was guilty. (*Ibid.*) This was an indirect or backdoor way of bringing in the truth of those statements of an accusation of guilt. (*Id.* at pp. 22-23.)

In Hopson's case, Detective Cobb testified about going for a ride with Thomas while Thomas showed detectives where to find things involved in the offense to which he was confessing. At that point, the assignment of guilt between Thomas or Hopson was not being discussed. The evidence was not offered to show that Thomas was speaking the truth about how the weapon got there. (*United States v. Meises, supra,* 645 F.3d at p. 21.)

Similarly, in *Ocampo v. Vail* (9th Cir. 2011) 649 F.3d 1098, the Court of Appeals rejected a prosecutor's attempt to bring in a description of the "critical substance" of testimonial statements inculpating the defendant, even though those statements were not introduced verbatim. (*Id.* at p. 1113.) The court said it was impermissible for a detective to "digest" or "outline" or "summarize" out-of-court statements and then present them for

20

their truth, such as when telling the jury that a nontestifying witness had identified the defendant as present at the shooting. (*Id.* at p. 1109.) The defendant had said he was not present. The prosecutor then argued the nontestifying witness had corroborated the statements of a testifying witness, who had identified the defendant as the perpetrator. (*Id.* at pp. 1111-1112.) This violated confrontation principles. (*Id.* at p. 1113; see *Minnesota v. Swaney* (Minn. 2010) 787 N.W.2d 541, 552-555 [agent's questioning of defendant's wife about items photographed at a crime scene, where items had been discussed out of court by defendant and wife in a recorded conversation, could not properly be used to imply that wife's statements were testimonial and established that defendant was at the scene].)

In Hopson's case, Cobb's account of the interview with Thomas was admitted into evidence not for the truth that Thomas put the weapon there, but to show the course of the investigation. In *People v. Mitchell* (2005) 131 Cal.App.4th 1210, 1224-1225 (*Mitchell*), portions of a police dispatch tape were deemed to be nontestimonial evidence that was not subject to *Crawford* restrictions, because they were introduced for purposes other than establishing the truth of the matter asserted. In *Mitchell*, much of the dispatch tape was not offered by the prosecution to establish the truth of the matter asserted in the recorded statements, but "to show how the pursuit unfolded and to describe the police officers' actions." (*Mitchell, supra*, at p. 1224.) Moreover, the voices heard on the dispatch tape were mainly those of those officers who testified at trial and were subject to cross-examination. "Accordingly, admission of their statements on the tape did not violate the confrontation clause or the principles announced in *Crawford*." (*Mitchell,*

*supra*, at p. 1224.) The truth of the matters discussed on the tape "was immaterial *to any contested matter in the trial.*" (*Ibid.;* italics added.) Also in *Mitchell*, any confrontation clause error in admission of the dispatch tape was harmless. (*Id.* at pp. 1224-1225.)

In *Livingston, supra*, 53 Cal.4th 1145, the nonhearsay purpose of the out-of-court statement was to explain certain conduct (why rival gang members ran across the street away from the defendant's car, which had someone in it shooting at them). It was relevant to an issue in the case, the location of the defendant and his easily recognizable car at the time of the shooting offense, as that affected the actions of the rival gang member who spoke. (*Id.* at p. 1161.) Introduction of that out-of-court statement was not done in violation of confrontation clause restrictions, because it was brought in for nonhearsay purposes, to show a response. (*Id.* at pp. 1162-1164; see *People v. Scalzi* (1981) 126 Cal.App.3d 901, 907; *People v. Samuels* (2005) 36 Cal.4th 96, 122 [out-of-court statement properly admitted to explain witness's subsequent actions]; *Cage, supra*, 40 Cal.4th at p. 975, fn. 6.)

The interview with Thomas, as he led detectives to the place where the weapon was found, was not brought before the jury as a hearsay statement that was being offered for the truth of the matter asserted. (§ 1200, subd. (a).) It was not a contested matter at trial whether Thomas knew the location of the weapon or if he was telling the truth about it. (See *Mitchell, supra*, 131 Cal.App.4th 1210, 1224-1225.) Similarly, in *United States v. Wright* (8th Cir. 2014) 739 F.3d 1160, 1170-1171, the testimony of one investigating officer about being told by another, "Come here[, w]e've got something," was properly offered to show its effect on the listening officer, that it caused him to enter a room, and it

22

was not improperly offered or admitted to show whether he found anything there. (See *United States v. Mitchell* (9th Cir. 2007) 502 F.3d 931, 966 [testimony by police officer, about information from a witness regarding a parked car, was offered as a basis for police action, not for its truth].)

Here, Cobb's testimony about the driving portion of the investigation was offered to show that statements from Thomas had an effect upon him as an investigator. (*United States v. Dupree* (2d Cir. 2013) 706 F.3d 131, 136.) The officers acted based on information they received from Thomas, that enabled them to locate the machete. These events were brought in for nonhearsay purposes that did not violate Hopson's confrontation clause rights, and there was no evidentiary error in this respect. (*Cage, supra*, 40 Cal.4th at p. 975, fn. 6.)

IV

*ADMISSIBILITY OF "ACTUAL STATEMENTS" BY THOMAS, AS DETECTIVE WHEELER REPORTED THEM IN REBUTTAL; NO CUMULATIVE ERROR*

A. Arguments; Section 1202

Hopson contends the trial court violated her confrontation clause protections when it admitted evidence at trial, "actual" out-of-court statements by Thomas, as reported to the jury by Detective Wheeler during the prosecution's rebuttal case. Wheeler testified about the verbal statements Thomas made after his arrest and while being interviewed. At that point, Thomas was remorseful and told detectives that it was Hopson who planned the robbery-murder and persuaded him to participate in it, and that she was the leader in cleaning up the scene and hiding the evidence. The trial court relied on section

23

1202 (impeachment of a hearsay declarant) to allow the detective to recount what Thomas said to the jury. Hopson claims this was prejudicial error under *Crawford, supra,* 541 U.S. 36, because she never had an opportunity to cross-examine Thomas.

At the outset of trial, the court said that if the prosecutor wanted to introduce Thomas's statements for impeachment purposes, the matter would be addressed at a sidebar. Toward the close of Hopson's testimony, the prosecutor argued that in rebuttal, he should be allowed to bring in impeachment of hearsay declarations that came in through her testimony, on state of mind. (§ 1250 [declarant's state of mind hearsay exception]; § 1202 [credibility of hearsay declarant].)[4] The trial court ruled that the prosecutor could have Detective Wheeler testify about the statements Thomas made to detectives, when Thomas confessed his participation but said that Hopson was the driving force who was always in charge of creating, pursuing, and executing the plan. The court relied on section 1202, saying that the prior inconsistent statements would be admissible for that limited purpose.

On rebuttal, Detective Wheeler testified that Thomas told officers during his November 1 interview that Hopson wanted to forcibly take any travel money Brown would have on hand, but he tried to talk her out of it. However, he gave in when Hopson told him that Brown would be an "easy target." As arranged, Hopson brought Brown out to the garage, where Thomas hit her with the machete. Hopson held a bloody knife in her

---

4    The prosecutor seem to be arguing the applicability of section 1250 (existing mental or physical state), but the court reporter transcribed it as section 1215 (no such section).

hand as she leaned over Brown's body. Afterward, Hopson discouraged Thomas from calling the police, said they should get rid of the body, and that Coca Cola could be used to clean up and hide blood residue, as she had learned on television. When they went to McDonald's afterward, Thomas said Hopson was able to eat a snack, but he was too upset to do so.

Hopson now asserts her rights to confrontation of witnesses were violated in this way, through the use of Thomas's "actual" statements as reported at trial, after his death (as contrasted to what she calls his "implied" statements discussed above, e.g., where to find the machete). According to Hopson, the trial court erred in applying section 1202, which allows prior inconsistent statements of a hearsay declarant to be allowed for impeachment purposes.

It is not clear from the briefs whether Hopson is arguing that Thomas's reported statements were being erroneously used to impeach (a) her own defense testimony about her own role, or (b) to impeach her version of what Thomas said to her during the offenses, about how he was actually the prime mover in the killing and he repeatedly threatened Hopson not to tell, or she or her son would be harmed. Hopson claims that her testimony about why she kept quiet until after he died, and only then told the jury about his threats to her, was unfairly undermined by testimonial statements by Thomas, who could never be cross-examined.

It is also unclear from the respondent's brief whether the Attorney General is assuming that the rebuttal testimony affected the credibility of Hopson as the defendant, or Thomas as the declarant. For example, respondent contends that the admission of

25

Thomas's statements to Detective Wheeler was not a violation of the confrontation clause, "as his statements were admissible for the nonhearsay purpose of impeaching *his statements previously admitted through appellant's testimony*." (Italics added.) Strictly speaking, Hopson did not obtain admission of the truth of Thomas's "threatening" statements, simply by the way she reported them. (§ 1200, subd. (a).) Instead, she presented her own testimony about how the dynamics of their relationship affected the commission of the offense.

The trial court's ruling did not properly apply section 1202, because Thomas's statements, as a declarant, were not received in evidence as hearsay offered for the truth of the statements, pursuant to section 1200, subdivision (a). Section 1202 applies to impeaching a hearsay declarant by his or her own inconsistent statements, whether the declarant was ever given an opportunity to explain or deny the inconsistency, or not. (*People v. Curl* (2009) 46 Cal.4th 339, 361-362.) " 'The purpose of section 1202 is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity for cross-examination,' " of the hearsay declarant. (*Curl, supra*, at p. 362, quoting *People v. Corella* (2004) 122 Cal.App.4th 461, 470.) That is not our case.

Read in context, the apparent purpose of the rebuttal testimony from Detective Wheeler was to attack the credibility of Hopson as a testifying defendant, with regard to her fear of Thomas as supposedly motivating her to cooperate with him in covering up the killing of Brown. According to Detective Wheeler, Thomas's statements to him blamed Hopson, which was markedly different from how Hopson described the events in court.

26

Whatever the stated basis of the trial court's ruling, we are required to resolve, consistent with confrontation clause principles, whether it was proper for the court to admit Detective Wheeler's testimony about Thomas telling detectives that Hopson persuaded him to attack Brown for purposes of robbing her, and she took the leadership role in concealing evidence of the killing. We consider whether Thomas's statements were admissible for the nonhearsay purpose of impeaching Hopson's credibility, on her claim that she was coerced into doing what she did by her fear of Thomas. She brought into issue her own credibility about her relationship with Thomas during the offense, as follows.

B.  Additional Facts from Cross-Examination and Rebuttal Testimony

During cross-examination, Hopson agreed that when she was interviewed, she told detectives that Thomas was her "big snuggly teddy bear," and never said he had threatened her. She remembered telling them about the "weird guy" she saw walking around the neighborhood that week, but was confused if she said his hair was blond or black. She knew that Brown made money as a registered nurse, and assumed she would be taking money with her on her planned trip. Hopson described preparing to move into her new apartment the day after Brown was killed, by applying for payday loans.

In her redirect testimony, Hopson said she heard in jail that Thomas had made a statement that accused her of planning Brown's robbery and killing. She said he was wrong in telling detectives that she told him Brown would have some travel money and they should rob her. She denied telling Thomas to hide in the garage so she could bring Brown out there. Rather, she only cleaned up at his direction and helped get rid of the

27

body because she was afraid of him. She said he was mistaken in telling detectives that she ate the food ordered at McDonald's without a problem, after Brown was dead.

As previously summarized in the factual statement, *ante*, in rebuttal, Detective Wheeler testified about his interview with Thomas, when Thomas cried, blamed Hopson for the plan, and told him he now wanted to make it right for Brown's family. When Wheeler talked to Hopson, she was dry eyed and did not seem concerned about Brown. Brown's missing wallet and purse were never found.

In rebuttal testimony from Thomas's fiancée, she said she did not know he had a girlfriend that he visited while she was at work. She and Thomas had a four-year-old daughter together, and she did not know him to be a violent person and did not want his memory tarnished.

The prosecutor's investigator looked for Thomas's criminal history, but found he had no past convictions or arrests. The investigator had a transcript of Hopson's jail telephone conversation that occurred a few days after her arrest, with her son and her best friend. Hopson told her friend that she ran into Thomas, who told her to be strong and said that they would "get through it" if they prayed. Hopson wanted to write him a letter and asked for his jail address. She told her son that Thomas said, "Hi."

After Thomas killed himself, the investigator searched his cell, finding Hopson's letters to him dated December 7 and 10, 2011. In them, Hopson and Thomas were corresponding about information that her attorney had read to her, that Thomas had made a statement on November 1, 2011 about the case and their roles in it. Among other things, Hopson wrote, "The things that were said in the statement shocked me, and I

28

could not believe you would say those things about me. It caused me to be confused and have doubts, because you said you would never hurt me, and what she said you said cut me to the core of my being. . . . [¶] . . . Please don't leave me or forsake me. I promise you with all that I am that I have never betrayed you. . . . My love has never changed and never will, even if yours has."

In a letter from Thomas found in Hopson's cell after his death, he denied making the statement she was talking about. The letter told her, "But now you say I have forsaken you. Okay, that's fine. You want to talk about lives destroyed. You're a hypocrite. It's funny how all the same things you said I have said, they were said to me as well. But that does not matter now. You act as though you're the only one here. Uhm, hello, I am too. [¶] Well, you have said enough. Don't write to me, because at this point I don't really care. It's like whatever, you always believed what you heard. It's your naiveness [sic] that's playing with you again. [¶] Goodbye. Like you said, you won't write no more. That's fine. You did this, not me. . . . Don't waste my time no more. That's how you want to be. Well, have a nice life."

After the investigator testified about the letter Thomas wrote to her, saying "you did this, not me," Hopson testified on further redirect examination that Thomas must have been referring to her letter in which she broke up with him. She did not interpret his letter as accusing her of killing Brown.

During closing arguments, the prosecutor started off by saying Hopson had made the plan for Thomas to lie in wait for Brown in the garage, so Hopson could bring her out

29

there. Brown had evidently been interrupted during her preparations for her trip and the items on her to do lists had not all been crossed off.

The gist of the defense attorney's closing argument was that Thomas called the shots in their relationship and throughout this offense, leading Hopson to cooperate with him out of fear. In reply, the prosecutor argued that Hopson was lying about threats to herself and her son. Instead, her actions showed that she planned to kill the "easy target" she had identified, but it appeared from the to do lists that Brown had not yet been to the bank to get money. Although the prosecutor talked about Thomas's confession to the detectives as showing that Thomas had a conscience and wanted to help Brown's family, his argument mainly dwelled on the lies that he believed Hopson had told, "all the way through this case."

## C. Authority

In *Street, supra,* 471 U.S. 409, the United States Supreme Court found no violation of confrontation rights had occurred at a trial in which the defendant testified that a confession he had made to a detective was coerced, such that he was forced to say the same thing as his accomplice had said in his own confession (both made out of court). The accomplice was not a testifying witness. In rebuttal, the prosecutor was allowed to call the detective as a witness, to read the accomplice's confession to the jury and then to explain the differences between the two confessions. The high court said that the purpose of the rebuttal testimony was not impermissible, and that the introduction of the accomplice's confession was not being done to prove the truth of what was said in it. Instead, the confession evidence had a nonhearsay purpose, to rebut the defendant's

30

testimony that his own confession was coercively derived from the other one. (*Id.* at pp. 415-417.)

Moreover, in *Street*, *supra*, 471 U.S. 409, the defendant had the opportunity to cross-examine the law enforcement witness who presented that information against him, and there was no deprivation of his right to cross-examine the accomplice, since the accomplice's confession was not being presented for its truth. The jury was properly given the opportunity to compare the two confessions, to decide whether the defendant was telling the truth about his defense of "the immediate issue of coercion" of his confession. (*Id.* at p. 416.) The trial judge had appropriately instructed the jury to limit its use of the evidence in a manner consistent with the confrontation clause.

In a concurring opinion in *Street*, *supra*, 471 U.S. 409, two Justices said that the out-of-court confession was admissible for nonhearsay purposes and was proper rebuttal to the defense testimony, and "it is important to note that [defendant] created the need to admit the statement by pressing the defense that his confession was a coerced imitation of [the accomplice's] out-of-court confession." For those reasons, the confrontation clause did not bar the evidence. (*Id.* at pp. 417-418 (conc. opn. of Brennan J. & Marshall, J.).) In *Crawford, supra,* 541 U.S. at page 59, footnote 9, the court relied on *Street* as support for its conclusion that evidence admitted for a nonhearsay purpose does not have confrontation clause implications.[5]

---

5 Compare *Williams v. Illinois* (2012) ___ U.S. ___ [132 S.Ct. 2221, 2255-2256, 2259–2260 (conc. opn. of Thomas, J.), in which *Street, supra,* 471 U.S. at page 417, was distinguished on how to apply the proposition that the confrontation clause does not bar

In *United States v. Cruz-Diaz, supra*, 550 F.3d 169, the court ruled that the admission into evidence of an out-of-court confession of a codefendant did not violate a defendant's confrontation clause rights, because the statement was admitted to explain why the criminal investigation was terminated, and not for the truth of the confession. (*Id.* at p. 177.) In its analysis, the appellate court ruled that one of the defendants had opened the door to testimony about the out-of-court statement, from the law enforcement authorities to whom it was made, by arguing the investigation was inadequate. (*Id.* at p. 175.) The out-of-court statement was offered to explain why the agents had stopped investigating, because of the confession they obtained that led them to conclude they had the right suspects. Thus, the defendant's "trial strategy opened the door to the statement's admission." (*Id.* at p. 176.) Within the scope of *Street, supra*, 471 U.S. 409, the trial court had properly admitted that out-of-court statement, "not to prove the truth of the matter asserted but to rebut [the codefendant's] attempt to cast doubt on the integrity of the government's investigatory efforts. The district court instructed the jury as to the limited nature of the statement's admission. And the government's interest in introducing the substance of the confession, rather than a more sanitized narrative, was both legitimate and strong." (*Cruz-Diaz, supra,* at pp. 179-180.)

In *People v. Reid* (2012) 971 N.E. 2d 353 (*Reid*), the highest court in New York enumerated federal and state court opinions that have held, " 'a defendant can open the

the use of out-of-court statements for purposes other than their truth. Justice Thomas said the views in *Street* "did not accept that nonhearsay label at face value," but it "thoroughly examined the use of the out-of-court confession and the efficacy of a limiting instruction before concluding that the Confrontation Clause was satisfied '[i]n this context.' " (*Williams, supra,* at p. 2257; conc. opn. of Thomas, J.).)

32

door to the admission of evidence otherwise barred by the Confrontation Clause.' " (*Id.* at pp. 356-357, citing, e.g., *United States v. Cruz-Diaz, supra*, 550 F.3d 169, 178; *United States v. Lopez-Medina* (10th Cir. 2010) 596 F.3d 716, 733; *United States v. Holmes* (8th Cir. 2010) 620 F.3d 836, 843-844; *United States v. Acosta* (5th Cir. 2007) 475 F.3d 677, 683-684; cf. *United States v. Cromer* (6th Cir. 2004) 389 F.3d 662, 679 [confrontation rights are not erased when a defendant opens the door to admission of a testimonial out-of-court statement].)  The court in *Reid* said it agreed with that emerging consensus, that a defense strategy or tactic can open the door to admitting evidence that could otherwise be prohibited by the confrontation clause.  (*Reid, supra,* at p. 357.)

In *Reid*, the court explained its reasoning:  "If evidence barred under the Confrontation Clause were inadmissible irrespective of a defendant's actions at trial, then a defendant could attempt to delude a jury 'by selectively revealing only those details of a testimonial statement that are potentially helpful to the defense, while concealing from the jury other details that would tend to explain the portions introduced and place them in context' [citation].  A defendant could do so with the secure knowledge that the concealed parts would not be admissible under the Confrontation Clause.  To avoid such unfairness and to preserve the truth-seeking goals of our courts [citation], we hold that the admission of testimony that violates the Confrontation Clause may be proper if the defendant opened the door to its admission." (*Reid, supra*, 971 N.E. 2d 353, 357.)

### D.  Analysis

We examine whether the statements Thomas made about Hopson's participation in the killing, as given to the detectives after his arrest and thus deemed to be testimonial

under those circumstances, were properly admitted for reasons other than establishing the truth of the contents of his statements. Hopson's defense strategy put at issue her credibility as to why she cooperated with Thomas after he had carried out the killing (because of her fear of him). Her cross-examination was conducted by the prosecutor in an extremely argumentative manner, in which he emphasized her previously expressed love for Thomas, her "teddy bear," as contrasted to her recent testimony that he told her he had killed somebody else and was threatening her and her son, even from the grave, such as through "somebody with long scraggly blond hair." The prosecutor asked her why she had waited 15 months after Thomas died to accuse him of threatening her, and when she said she did not know how to tell the truth about it, he said he believed her when he heard her say she did not know how to tell the truth, because of her lies to Timm and her coworker.

Defense counsel made a few objections that the prosecutor was being argumentative, when the prosecutor asked Hopson about her "very nice little dance" with her defense attorney in presenting "each piece of damning evidence" and explaining it. Defense counsel objected when the prosecutor scolded Hopson for trying to control him during her cross-examination. In redirect testimony, defense counsel asked Hopson about the police reports in which Thomas accused her of planning the event. The prosecutor objected on hearsay grounds, which were overruled.

In rebuttal, Detective Wheeler described how Thomas confessed to detectives about how the killing occurred. When the prosecutor asked whether Thomas knew he was taking detectives to the evidence that would convict him, an objection was sustained,

34

but the prosecutor rephrased to ask whether Thomas knew he was taking detectives to evidence that would be used in investigating the killing of Brown (answer, yes).

During her own testimony, Hopson brought in multiple layers of hearsay. In general, evidentiary rules were very loosely applied at this trial and few restrictions were observed by either side, or by the trial court. Even so, to the extent Thomas's out-of court statements contradicted Hopson's account, they could have been offered to show not their truth but their falsity. (*People v. Hinton* (2006) 37 Cal.4th 839, 893 (*Hinton*).) "Indeed, the statements were offered for their falsity to rebut defendant's claim that he had lied to the police . . . and thus [showed] that defendant's stated reason for lying to the police was untrue." (*Ibid*.)

To the extent Hopson failed to challenge any conclusions about the manner in which she "opened the door" to the admission of Thomas's statements through Detective Wheeler's testimony, we could easily find she has forfeited the issue. (*Hinton, supra*, 37 Cal.4th at p. 893; *Reid, supra*, 971 N.E. 2d at pp. 356-357.) She testified in layers of multiple hearsay and brought Thomas's character and actions into issue as her key defense point. She should not be heard to complain on appeal that the prosecution should not have been able to produce evidence that rebutted her version of the offense. She was allowed to cross-examine Detective Wheeler and did so. She did not request any limiting instructions or admonitions on the use of his evidence, and does not complain of any such omission on appeal. CALCRIM Nos. 318, 358 and 362 nevertheless were used to educate the jury about how to evaluate prior statements of witnesses or the defendant, and consciousness of a defendant's guilt from false statements.

35

Within the scope of *Street*, *supra*, 471 U.S. 409, the jury was properly given the opportunity to compare the two versions by the two participants about what happened in the garage the night that Brown was killed, to decide whether Hopson was telling the truth about "the immediate issue of coercion," which was her theory of defense. (*Id.* at p. 416.) Wheeler's account of Thomas's out-of-court confession was admissible for nonhearsay purposes, in rebuttal to the defense testimony. Hopson "created the need to admit the statement by pressing the defense" (*id*. at p. 417 (conc. opn. of Brennan J. & Marshall, J.)) that she was coerced into hiding the evidence, at least. How she responded to Thomas's asserted threats was an issue in the case that was fair game for rebuttal. His statements were not presented for their truth, but to show that her version was not believable, when considered with the rest of the evidence. (*Ibid.*) Her confrontation clause protections were not violated.

We also agree with respondent that Thomas' statements were admissible for the nonhearsay purpose of explaining why Hopson apparently continued to stay friends with Thomas up until the weeks before his death, consistently claiming a homeless man must have done the killing, and why she did not start to blame Thomas for planning the killing until she became aware he had made statements against her. She then changed her tactics to accommodate his version of what happened. This set of circumstances and her own testimony properly invoked the duty of the court to make rulings that would promote "truth-seeking." (See *Reid, supra*, 971 N.E.2d 353, 357.) Even if we assume there were a confrontation clause problem posed by Thomas's reported testimonial statements, in the nature of "bleeding over" from impeachment into substantive evidence about the identity

36

of the killer, we conclude the rebuttal testimony from Detective Wheeler was properly admitted because Hopson "opened the door to its admission." (*Ibid.*)

Because we have found no constitutional error as claimed in both of Hopson's arguments, no cumulative error occurred.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

AARON, J.