Filed 10/6/15  P. v. Williams CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARLON WILLIAMS,<br><br>    Defendant and Appellant. | B258741<br><br>(Los Angeles County<br>Super. Ct. No. TA126746) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Kelvin D. Filer, Judge.  Affirmed.

John Lanahan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General and Lance E. Winters, Assistant Attorney General, Michael C. Keller and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant and appellant Marlon Williams appeals from a judgment following a jury trial in which he was convicted of second-degree murder. On appeal, he challenges the admission of certain hearsay statements against him as a violation of his right to confront witness against him (U.S. Const., 6th Amend.) as well as the particular hearsay exceptions under which the evidence was admitted. We affirm.

## PROCEDURAL BACKGROUND

On May 23, 2013, defendant and his two comrades, Darnell Snell and Cordell Hawkins, were charged by information with the murder (Pen. Code, § 187, subd. (a)) of Ashton Croswell. It was alleged that defendant personally and intentionally discharged a firearm, which caused great bodily injury or death to the victim. (Pen. Code, § 12022.53, subd. (d).) It was further alleged that the offense was committed for the benefit of a criminal street gang, within the meaning of Penal Code section 186.22, subdivision (b).

Defendant's motion to sever his trial from that of Snell and Hawkins was granted. Defendant's trial initially resulted in a deadlocked jury and a mistrial was declared.[1] At his retrial, the jury convicted defendant of murder, and found the murder to be in the second degree. The jury found the firearm enhancement true, but the gang enhancement not true. Defendant was sentenced to a term of 15 years to life for the murder with a consecutive term of 25 years to life for the firearm enhancement. Defendant filed a timely notice of appeal.

## FACTS

Defendant, Snell and Hawkins are all members of the Bounty Hunter Bloods gang. The main rival gang of the Bounty Hunter Bloods is the Grape Street Crips. The rivalry

---

[1] In defendant's opening brief on appeal, he states that "two mistrials had been declared." The record does not support this conclusion. Defendant's motion to sever was granted during jury selection in the initial joint trial. He was then permitted to start trial anew with a new jury panel. There is no indication that a mistrial was declared when severance was granted.

2

between Bounty Hunter Bloods and Grape Street Crips is "the most heated and violent gang rivalry" known to the prosecution's gang expert. Although there were relative periods of calm between the two gangs, there had been a confrontation between Bounty Hunter Bloods and Grape Street Crips on Halloween 2012 in which three people were shot.

The shooting in this case occurred on November 6, 2012 – less than a week after the Halloween shooting – when crimes between the two gangs were escalating. Although some of the details of the present shooting were disputed, the main facts were these. Three men were involved in the shooting: a shooter, another gunman who did not shoot, and a driver. At around 7:00 p.m., when it was dark, the driver drove into Grape Street Crip territory and parked on a side street near where 10-12 Grape Street members had congregated. The shooter and the other gunman got out of the car. They were wearing dark clothes, including black hoodie sweatshirts, with the hoods pulled up over their heads. They approached the group. The shooter said, "What set you from?" and immediately began shooting. The other gunman tried to remove his gun from his waistband, but never got off a shot. The crowd immediately scattered as soon as the shooter began firing. When the shooter finished, he and the other gunman ran back to the car; the driver had the car running and waiting for them.

Ashton Croswell, a Grape Street Crips associate, was shot in the buttocks. The bullet exited his torso and reentered his right arm. He was taken to the hospital, where he died eight days later as a consequence of blood loss caused by the shooting.

No physical evidence or eyewitness testimony tied defendant, Snell, or Hawkins to the crime. Initially, the police had some reason to suspect a Bounty Hunter Bloods member named Dameon.[2] They arrested Dameon, who was placed in a jail cell with a confidential informant working in an undercover capacity for the Los Angeles Police Department. Dameon confided to the informant that defendant had been the shooter.

---

[2]    Dameon was apparently linked to the shooting on social media, and Croswell may have identified him at the scene in a spontaneous statement.

3

Police then arrested defendant. Defendant was placed in the cell with the same undercover informant, who recorded their conversation. Believing the informant to be a fellow gang member, defendant admitted to the informant that the police had previously arrested the wrong person. Defendant told the informant that he, in fact, had been the shooter. He identified Snell as the other gunman, who did not shoot, and Hawkins as the driver. Neither Hawkins nor Snell was "Dameon." Defendant recounted the circumstances of the crime to the informant and, at one point, demonstrated how he had pulled his hoodie over his head so he could not be seen.

Prior to being placed in the cell, defendant had been permitted to use the telephone. He called Snell; police recorded the telephone call. In the call, Snell said to defendant that they needed to talk to Hawkins.

Snell was arrested next. He, too, was placed in a cell with the confidential informant, who recorded their conversation. Snell expressed concern that the police were trying to charge him with murder even though he had not fired a weapon. He explained that he was there at the time of the murder, but that he "punked out" and did not shoot. He identified defendant as the shooter and Hawkins as the driver.

At trial, defendant offered an alibi defense. Both defendant and his then-girlfriend testified that defendant spent the entire night at the girlfriend's house. The alibi was questionable, given that, when defendant was arrested and questioned by police, he offered the *different* alibi that he had been at home at the time of the shooting. As to the admissions defendant made to the confidential informant, defendant testified that he was frightened of the larger man, and was trying to fit in. As to defendant's knowledge of the way the crime had been committed, defendant explained that he had simply told the man information about the crime that he had heard on the street and read about on Facebook.

4

## DISCUSSION

1.    *Snell's Recorded Statement to the Informant*

Defendant contends the trial court erred in admitting into evidence Snell's recorded statement to the confidential informant.  Defendant argues that the admission of the statement violated both his constitutional right to confrontation and the California Evidence Code.

Defendant's confrontation clause argument is easily addressed.  The confrontation clause is concerned with *testimonial* statements.  (*Crawford v. Washington* (2004) 541 U.S. 36, 51.)  If the statement is not testimonial, it is not subject to the confrontation clause.  (*People v. Cage* (2007) 40 Cal.4th 965, 981, fn. 10 (*Cage*).)  We are here concerned with a statement Snell made, while in a jail cell, to a man he believed to be a fellow gang member, but who turned out to be a confidential informant working for the police.  Such statements are not testimonial.  (*People v. Arauz* (2012) 210 Cal.App.4th 1394, 1402 (*Arauz*).)  Defendant concedes the *Arauz* opinion defeats his argument, but suggests that it was wrongly decided.  We disagree.  *Arauz* properly recognized that informal statements made by an arrestee to an individual believed to be a fellow inmate are not testimonial because they are not statements in which witnesses make solemn declarations or affirmations for the purpose of proving some fact or which they expect to be offered in evidence.  (*Cage* at p. 981.)  The last thing an inmate confiding in another purported inmate expects is for his statement to be repeated in court.  (*Arauz* at p. 1402.)

Defendant next argues that Snell's statement to the confidential informant was improperly admitted under Evidence Code section 1230 as a declaration against interest.[3]

---

[3]    Evidence Code section 1230 provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social

5

To be admissible under that provision, the proponent of the evidence must show that: (1) the declarant is unavailable; (2) the declaration was against the declarant's penal interest when made; and (3) the declaration was sufficiently reliable to warrant admission despite its hearsay character. (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) It is undisputed that Snell was unavailable at defendant's trial. Snell had been tried separately, but his appeal was pending, and he asserted his Fifth Amendment privilege against self-incrimination. We review a court's decisions as to whether a statement is against a defendant's penal interest and whether it is sufficiently trustworthy for abuse of discretion. (*People v. Lawley* (2002) 27 Cal.4th 102, 153; *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.)

We first consider whether Snell's statement to the informant was a statement against his penal interest. Snell admitted being with defendant when defendant shot Croswell. He also admitted to having had a gun, and hiding it after the shooting. He appeared to admit a gang motive for the shooting.[4] All of these statements were inculpatory, and the trial court did not abuse its discretion in determining they were against Snell's penal interest. Defendant suggests, however, that because Snell's statement tended to minimize his culpability – by pointing out that he did not shoot because he "didn't have the heart for it" – it was not against his interest. To be sure, when a purported declaration against interest includes statements which tend to sympathetically describe the declarant's participation, minimize his responsibility for the injuries caused, and imply others should bear a greater share of the responsibility, those

---

disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

[4]     The transcript of Snell's conversation with the informant is not entirely intelligible. In the course of the conversation, Snell admitted to "snatching . . . chains." He said that when "we went to go turn the chain in we got into it with some" Grape Street gang members and there was some level of a confrontation in which one of Snell's "hom[ies]" was shot in the leg. He told his cohorts that they would get revenge, but not immediately.

6

parts of the declaration should not be admitted. (*People v. Duarte, supra,* 24 Cal.4th at p. 613.) But that rationale does not apply to a situation in which the declarant's participation was *in fact* lesser to that of the defendant. It was undisputed that there was only one shooter and that the second gunman did not get off a shot. Moreover, defendant admitted to being the shooter. In that circumstance, Snell's statement that he did not shoot was not an attempt to minimize his responsibility and gain sympathy, but an honest admission of his lesser level of participation.[5]

Next, the trial court did not abuse its discretion in concluding Snell's statement had sufficient indicia of reliability to be admitted. " 'There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.]' [Citation]." (*Arauz, supra,* 210 Cal.App.4th at p. 1400.) Here, the context of Snell's statement gives it reliability. Snell had been questioned by police and given them a variety of different alibis and explanations of his activities on the night of the shooting. He was then placed in a cell with the confidential informant. Snell and the informant discussed their mutual gang involvement, and when Snell said he was charged with murder, the informant stated that he was charged with murder as well. The informant sympathetically discussed Snell's situation with him. Snell told the informant that he did not tell "them" (presumably the

---

[5] A declaration against penal interest can be redacted to excise any statement or portion of the statement that was not specifically disserving of the declarant's penal interest. (*People v. Duarte, supra,* 24 Cal.4th at pp. 612-613.) Defendant notes, on appeal, that "[n]o attempt was made to redact [Snell's] statement to limit it to his self-incriminating statements, . . . ." To the extent this is intended as an assertion of error in failing to redact Snell's statement, it is unsupported by argument or authority, and the contention is therefore considered abandoned. (*Huntington Landmark Adult Community Assn. v. Ross* (1989) 213 Cal.App.3d 1012, 1021.) In any event, defendant never requested that the trial court redact Snell's statement to the informant in any way. Thus, the contention is waived.

7

police) that he was at the shooting, but admitted to the informant that he actually had been. This context gives rise to the inference that Snell's statement to the informant was reliable; Snell had been questioned at length by police, and had begun to cry when he was told he was being booked for murder. Upset, and facing the possibility of a lengthy prison term, Snell was placed in a cell with someone he believed to be a friend, and unburdened himself in the hopes of obtaining advice.

2.      *Snell's Statement in a Recorded Telephone Call*

The prosecution successfully introduced Snell's recorded conversation with the informant into evidence. In response, defendant introduced as prior inconsistent statements evidence of Snell's responses to police interrogation in which Snell gave various alibis for the evening.

Prior inconsistent statements of a testifying *witness* are admissible under Evidence Code sections 1235 and 770, which require the witness to have the opportunity to explain or deny the statement. However, prior inconsistent statements of a *hearsay declarant* are governed by Evidence Code section 1202. That section provides, in pertinent part, "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." The trial court properly admitted Snell's responses to police interrogation under Evidence Code section 1202. Snell had given the police a wide variety of different stories when questioned about the shooting, including that a couple guys had asked him to go with them, but he refused and never saw the guys again that night.

After defendant was permitted to introduce this evidence, the prosecutor sought to introduce evidence of yet another statement of Snell's. Specifically, the recording of a telephone call Snell made the day after he was arrested. In the phone call, Snell spoke to an unknown family member and stated that defendant came to his house that night and admitted shooting someone. The prosecution's theory was that the phone call was itself

8

an inconsistent statement, admissible under Penal Code section 1202. The trial court agreed.

On appeal, defendant initially argued that the evidence of Snell's phone call was improperly admitted because it lacked sufficient indicia of reliability. The Attorney General responded that the phone call was not admitted as a declaration against interest, but as an inconsistent statement under Evidence Code section 1202. In his reply brief, defendant concedes that the phone call was properly admitted if it impeached other statements that were properly admitted. The phone call was admitted because it was inconsistent with one of Snell's statements to police, which was itself admitted at defendant's request, as being inconsistent with Snell's statement to the informant. There was therefore no error.

### 3. *Croswell's Statements to his Sister*

Defendant's last contention is that the trial court erred in admitting into evidence certain statements the victim, Croswell, made to his sister before he died. Those statements were admitted as inconsistent statements of a hearsay declarant (Croswell) under Evidence Code section 1202.

At the crime scene, after he was shot, Croswell told a friend, Robert McCovery, that " '[i]t was . . . Dameon from Bounty Hunters, man. [He] said he was going to come and get me.' " This statement was itself admitted as a prior inconsistent statement of McCovery; McCovery denied at trial that Croswell ever told him this, although he conceded that he told police that Croswell had. When asked why, McCovery explained that he had heard on the street that Dameon was the shooter.

As Croswell's statement was itself a hearsay declaration, the prosecution sought to admit other verbal and non-verbal statements Croswell made which undermined the credibility of that statement. Two days after Croswell was first brought to the hospital, his sister wanted to help determine who had shot him. Croswell had a tube down his throat and could not speak, but his sister believed that he could hear her and respond. Croswell's sister showed Croswell some internet photos on her iPad – pictures of

9

Dameon, defendant, and someone named Jason. She chose those three people based on what she had heard on the street. She showed each picture to Croswell, and asked if he knew the person pictured and if that person had shot him. Croswell's sister showed him only those three photographs, and Croswell nodded to each of the three. She did not share this information with police at this time.

The day before Croswell passed away, his sister had another conversation with him. The tube had been removed, and Croswell was able to respond verbally. Croswell said that Marlon had shot him, Dameon had been there, and he did not know who Jason was. Croswell's sister did not give this information to the police until one week later. She wasn't sure if what Croswell had told her was true, and she wanted to gather more evidence. She listened to what people were saying on the street; the names she heard were those of defendant, Snell, and Hawkins.

On appeal, defendant challenges the admission into evidence of Croswell's two conversations with his sister, in which he identified defendant.[6] As Croswell's identification of defendant as the shooter was contrary to his spontaneous statement at the scene where he identified Dameon, the evidence was properly admitted under Evidence Code section 1202.

Defendant argues, however, that the statements Croswell made to his sister were testimonial, and their admission violated his right to confrontation. A testimonial statement is one in which a witness makes a solemn declaration or affirmation for the purpose of proving some fact. (*Cage, supra,* 40 Cal.4th at p. 981.) To be sure, an unsworn statement can be testimonial (*id.* at p. 982) but it must "have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony." (*Id.* at p. 984.) Moreover, to be testimonial, the statement must have been given and taken primarily for the purpose of testimony – to establish or prove some past fact for possible use in a criminal trial. This is to be determined objectively, considering

---

[6]     Defendant makes no argument regarding the information Croswell's sister heard on the street.

all circumstances that might reasonably bear on the intent of the participants in the conversation. (*Ibid.*)

It is apparent that, under this test, Croswell's statements to his sister were not testimonial. First, there was no formality and solemnity. This was not official police questioning and nobody was even taking notes. This was simply Croswell's sister conducting her own informal investigation. Second, from an objective perspective, the purpose of the statements was not to memorialize Croswell's testimony for possible use in a criminal trial. Croswell's sister herself did not have that intent; she did not bring Croswell's statements to the police as evidence, but waited until she could confirm or contradict them by speaking with other people. As Croswell's informal statements to his sister were not testimonial, there was no confrontation clause violation in admitting them.

Defendant next argues that, even assuming the statements were not testimonial, they were improperly admitted under Evidence Code section 1202 to impeach Croswell's previous statement that Dameon had shot him. Defendant's theory is that Croswell *did not make* a previous statement that Dameon had shot him; McCovery had lied to the police when he told them that Croswell said Dameon was the shooter. While this is one view of the evidence, it is not the only one. In a pretrial hearing, defendant argued for the admission of Croswell's statement to McCovery, over the prosecution's objection, on the basis that it was a spontaneous statement or dying declaration. The trial court overruled the prosecutor's objection and granted defendant's request to use the statement. When McCovery was called to testify, he denied that Croswell made any such declaration. Defense counsel then elicited his admission that McCovery had, in fact, told the police that Croswell made such a statement. This constituted a prior inconsistent statement of McCovery which was admissible for the truth of the matter – i.e., that Croswell had, in fact, made the statement identifying Dameon. (Evid. Code, § 1235; CALCRIM No. 318.) As there was evidence that Croswell had made the spontaneous statement identifying

11

Dameon, the prosecution was permitted to impeach Croswell's credibility with contradictory statements under Evidence Code section 1202.[7]

## DISPOSITION

The judgment is affirmed.

RUBIN, J.

WE CONCUR:

BIGELOW, P. J.

GRIMES, J.

---

[7] There was no objection under Evidence Code section 352 that any probative value of these statements was outweighed by the probability of undue prejudice or jury confusion.